# Illinois Official Reports

## Appellate Court

---

### *In re J.S.*, 2020 IL App (1st) 191119

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Erika M., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>No. 1-19-1119 |
| Filed | January 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-JA-1248; the Hon. Nicholas Geanopoulos, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Amy P. Campanelli, Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Gina DiVito, and Leslie Billings, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Carrie C. Fung, of counsel), guardian *ad litem*. |

JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Lampkin and Burke concurred in the judgment and opinion.


## OPINION

¶ 1        In this appeal, Erika M. (respondent) challenges an order of the circuit court of Cook County finding her son, J.S., to be a neglected minor due to an injurious environment. Respondent also argues that (i) the circuit court erred in denying her motion for substitution of judge as of right and (ii) a section of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2018)) limiting substitution of judge as of right in certain instances (*id.* § 1-5(7)) denies parents the equal protection of the laws under the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2).

¶ 2        For the reasons discussed herein, we affirm.


## I. BACKGROUND

¶ 4        Respondent is the biological mother of seven children; the youngest, J.S., was born in April 2015. The older six children were the subjects of petitions for adjudication of wardship filed in 2007 or 2008, which were assigned to Judge Nicholas Geanopoulos: Ca. S. (07-JA-6), Jal. S. (07-JA-7), Jak. S. (07-JA-8), Ce. S. (07-JA-9), Jac. S. (07-JA-10), and A.S. (08-JA-76). J.S.'s putative father, Andre S., is the father of respondent's other children except for Ca. S. Andre is not a party to this appeal.

¶ 5        In adjudication orders entered in December 2008, the circuit court found that Ca. S., Jal. S., Jak. S., Ce. S., and Jac. S. were neglected as defined in section 2-3 of the Juvenile Court Act (705 ILCS 405/2-3 (West 2008)) based on injuries inflicted on Jak. S. Respondent was also found to be unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minors. Respondent's parental rights as to twins Jac. S. and Jak. S. were terminated in October 2011 based on her voluntary consent to their adoption. In September 2014, respondent's parental rights as to A.S. were involuntarily terminated based on, among other things, her desertion of A.S. for more than three months preceding the commencement of the termination proceedings; A.S. was subsequently adopted.

¶ 6        In March 2017, respondent filed a *pro se* "motion to vacate guardianship and [reinstate guardianship] with mother" (motion to vacate guardianship) with respect to her three older children who were not the subject of adoption proceedings. She filed the motion under the minors' 2007 case numbers. The circuit court subsequently appointed attorneys for respondent and the minors as well as a court appointed special advocate (CASA). In the following months, the CASA volunteer reported to the court, the public guardian's office subpoenaed school records, and the minors participated in therapy. The motion to vacate guardianship was continued to December 12, 2017.

¶ 7        While respondent's motion was pending, the Department of Children and Family Services (DCFS) received a report that two-year-old J.S. remained in her care. On November 28, 2017, the State filed a petition for adjudication of wardship and a motion for temporary custody with respect to J.S. (17 JA 1248). During a hearing on that date, Steven Shelley, a DCFS investigator, testified that he had several interactions with respondent following his assignment

to the matter in September 2017. In a meeting at her apartment on November 17, 2017, respondent had agreed to intact family services and a safety plan for J.S. As Shelley and respondent conversed, Andre entered the apartment using his keys. According to Shelley, Andre was upset when he learned of the arrangement because J.S. would be placed with a relative outside of the home. After Shelley went to his vehicle to run a background check on the relative, he was not allowed back into the apartment. Shelley returned on the same date with two police officers but did not gain access to the apartment. He left a voicemail for respondent, stating that DCFS needed to take protective custody of J.S. Shelley returned to the apartment building with law enforcement on November 20, 2017, but again did not gain entry.

¶ 8    Shelley requested that the court issue a child protection warrant based on his belief that J.S. was at risk of harm due to past domestic violence issues between respondent and Andre and between Andre and Jal. S. On November 28, 2017, the circuit court (a) issued a child protection warrant directing that J.S. be brought to DCFS and (b) entered a temporary custody hearing order that granted custody of J.S. to the DCFS guardianship administrator and scheduled a hearing on December 12, 2017, *i.e.*, the continued hearing date on respondent's motion to vacate guardianship as to Ca. S., Jal. S., and Ce. S.

¶ 9    Respondent did not attend the hearing on December 12, 2017, and her counsel withdrew the motion to vacate guardianship. J.S.'s case was continued on approximately six dates in January through April 2018; respondent did not appear at these hearings, and the child protection warrant was repeatedly extended. During this period, the circuit court entered orders directing certain police officers to appear and explain the efforts made to locate J.S.

¶ 10    After J.S. was located, respondent appeared in the circuit court for the first time in J.S.'s case on May 4, 2018, and the public defender's office—which had represented her in prior matters—was appointed as her counsel. Respondent's counsel then immediately moved for substitution of judge[1] pursuant to section 2-1001(a)(2) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1001(a)(2) (West 2018)), which provides, in pertinent part, that a motion for substitution of judge as of right shall be granted if it is presented "before trial or hearing begins" and before the judge to whom it is presented has ruled on any substantial issue in the case. *Id.* In denying the motion, the circuit court stated that, pursuant to the Juvenile Court Act, "add-on siblings aren't subject to" a substitution of judge as of right. The circuit court's ruling was based on section 1-5(7) of the Juvenile Court Act, which provides that a party shall not be entitled to exercise the right to a substitution of judge without cause under the Code in a proceeding under the Juvenile Court Act if the judge is currently assigned to a proceeding involving the alleged abuse, neglect, or dependency of the minor's sibling or half-sibling and that judge has made a substantive ruling in the proceeding involving the minor's sibling or half-sibling. 705 ILCS 405/1-5(7) (West 2018).

¶ 11    On May 4, 2018, the circuit court quashed and recalled the child protection warrant and entered an order granting respondent supervised visits with J.S. Respondent subsequently filed a motion to reconsider the denial of her motion for substitution of judge, arguing that the cases involving her other children had closed prior to the filing of the petition concerning J.S. and had remained closed as of the date of her substitution motion. Asserting that the circuit court had not entered an order reinstating wardship or reopening any of J.S.'s siblings' cases, respondent contended that (a) section 1-5(7) of the Juvenile Court Act did not apply and (b) her

---

[1]A written motion for substitution of judge is also included in the record on appeal.

substitution motion satisfied the requirements of section 2-1001(a)(2) of the Code. Respondent also argued that, even if section 1-5(7) was applicable, such provision denied her the equal protection of the laws guaranteed by the United States and Illinois Constitutions.

¶ 12    In its response, the State noted that respondent had filed her motion to vacate guardianship for Ca. S., Jal. S., and Ce. S. under their original 2007 docket numbers in March 2017. The State argued that the circuit court properly denied respondent's motion for substitution of judge because Judge Geanopoulos was currently assigned to a proceeding involving J.S.'s siblings. The State further contended that the policy reasons behind section 1-5(7) of the Juvenile Court Act and section 2-1001(a)(2) of the Code—*e.g.*, deterring "judge shopping" and strategic attempts to delay proceedings—supported the denial of respondent's motion. As to respondent's constitutional arguments, the State argued, in part, that (a) respondent was not similarly situated to parents subject to proceedings under other statutory schemes, *e.g.*, the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.* (West 2018)), the Illinois Parentage Act of 2015 (750 ILCS 46/101 *et seq.* (West 2018)), the Probate Act of 1975 (755 ILCS 5/1-1 *et seq.* (West 2018)), or the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2018)); and (b) the denial of a motion for substitution of judge as of right did not directly impair the exercise of a fundamental right.

¶ 13    The circuit court denied the motion to reconsider, finding that respondent had voluntarily reopened the proceedings with respect to three of her other children and such proceedings were pending at the time that J.S.'s petition for adjudication of wardship was filed. The circuit court also found that the issuance of the child protection warrant constituted a "substantive ruling." J.S.'s case thus continued before Judge Geanopoulos.

¶ 14    Two witnesses testified at the adjudication hearing: Kendra Cornett, a therapist formerly employed by Healthy Families Chicago; and Shelley. Although her counsel represented that she was in court earlier in the day, respondent did not attend the hearing.

¶ 15    Cornett testified she provided individual therapy for Ca. S., Ce. S., and Jal. S. in the fall of 2017. The original goal was to prepare the children for their transition home to respondent, but they ultimately stayed with their guardian because the motion to vacate guardianship was withdrawn. Ca. S. was 17, Ce. S. was 16, and Jal. S. was 12 or 13 years old.

¶ 16    Cornett testified that all three children reported that respondent and Andre lived together. Ca. S. reported that Andre sometimes made vague verbal threats, *e.g.*, "I'm gonna get you." She expressed frustration that respondent allowed Andre to speak to her in that manner. When Ce. S. would speak out "if something wasn't right," she was told by respondent and Andre that she talked too much. At one point, Ce. S. did not want to go to respondent's home, even for a visit. Both Ca. S. and Ce. S. described an incident where Andre smashed their cell phones. Cornett testified, however, that neither reported being afraid, and Cornett was not concerned about their safety in respondent's home because of their ages and their supportive guardian.

¶ 17    Cornett testified that Jal. S. mentioned an incident with Andre when he was younger that resulted in DCFS involvement, but he did not provide details or a time frame. Unlike his older sisters, Jal. S. did not report any verbal threats by Andre.

¶ 18    Although Cornett described them as a "solid family," she testified that the children did not want to transition to full-time residence with respondent because they were concerned about her ability to adequately address their physical needs, *e.g.*, her ability to provide new clothing.

¶ 19     Following Cornett's testimony, the State submitted (a) certified orders for J.S.'s siblings, (b) an integrated assessment from January 2013, and (c) service plans approved in January 2011 and March 2015. Respondent's counsel did not object to their admission, but he urged the circuit court to afford the exhibits minimal weight because they were "remote in time."

¶ 20     Shelley testified that he was assigned to the J.S. investigation in September 2017 based on an allegation of a risk of harm. According to Shelley, respondent had two prior indicated reports[2] in approximately 2008: for head trauma to Jak. S. and risk of harm to her other children.

¶ 21     When Shelley went to respondent's apartment on September 19, 2017, Andre answered the door and stated that respondent and J.S. were out running errands. During assessments by Shelley, Andre stated that he did not have drug, alcohol, or domestic violence issues. Shelley returned to the apartment on the following day and met with respondent and J.S. Respondent denied drug or alcohol issues; she acknowledged past domestic violence issues with Andre but denied any ongoing issues. Although Shelley observed a thumbprint-shaped mark under his eye, J.S. told Shelley that he had not been spanked or hit. J.S. was very active during the visit.

¶ 22     Shelley performed a safety assessment of the apartment and concluded it was safe. Because J.S. did not have his own bed, Shelley spoke with respondent about DCFS providing one. During their conversation, respondent told Shelley that she did not want to disclose Andre's address because she did not feel comfortable doing so.

¶ 23     Shelley testified that he met with Ca. S., Ce. S., and Jal. S. at their school in September 2017. Jal. S. stated that there were no physical abuse issues with Andre (or otherwise) but that he was more comfortable living with his aunt because her home was calmer. Jal. S. told Shelley there were no problems when he and his sisters had visitation with respondent during the summer.

¶ 24     Shelley subsequently called respondent on September 26, 2017, to discuss a time to drop off the bed for J.S. She again declined to give Andre's address but did provide his telephone number. On November 14, 2017, Shelley met with respondent at her apartment; they discussed the proceedings regarding her three older children, and she provided the December 12, 2017, court date to Shelley. Shelley called Andre on November 14 and asked for his address; Andre hung up and did not pick up when Shelley called a second time.

¶ 25     Following his communications with respondent and Andre, Shelley was instructed by his supervisor to offer intact family services to respondent and to suggest a safety plan for J.S. while respondent completed those services. According to Shelley, DCFS recommended such services based on the couple's previous domestic violence issues and respondent's indicated investigation. DCFS recommended indicating the current investigation for the same reasons.

¶ 26     Shelley then testified regarding his meeting with respondent on November 17 (described above), wherein respondent agreed to the recommended services, but Andre expressed his disagreement after letting himself into the apartment. According to Shelley, Andre was visibly angry, he paced back and forth, and he was shouting; respondent attempted to calm him down. Shelley then testified about his inability to regain access to the apartment after going to his vehicle and his subsequent unsuccessful attempts to gain access in late November 2017.

_____

[2]An indicated report is a report of abuse or neglect supported by credible evidence following a DCFS investigation. *In re A.W.*, 231 Ill. 2d 92, 100 (2008); 325 ILCS 5/3 (West 2018).

¶ 27    Shelley testified on cross-examination that the apartment was clean and safe, with working utilities and adequate food. He did not observe any signs on J.S. of abuse or neglect, and he had no concerns regarding J.S.'s health based on his communications with J.S.'s doctor. After contacting the police department, Shelley was not concerned about current instances of domestic violence in the home.

¶ 28    During closing arguments, the state's attorney asserted that the family had a long history with DCFS. Counsel argued that Andre lived in the home, he had an angry outburst in front of J.S. on November 17, he did not comply with past services, and he had a history of domestic violence with respondent. The state's attorney also argued that Ca. S. and Ce. S. reported Andre yelled at them and smashed their phones.

¶ 29    The public guardian's attorney adopted the State's arguments and noted the prior indicated report for a head injury. Counsel also noted that the initial investigation began as an attempt to ameliorate the issues in the home, but the parents' lack of cooperation resulted in DCFS custody of J.S. According to the public guardian's attorney, respondent's reversal on her prior agreement to participate in intact services demonstrated Andre's influence over her.

¶ 30    Respondent's counsel noted that a decade has passed between the current investigation and the findings regarding respondent's other children. He argued that the sole reason DCFS took temporary custody was because respondent and J.S. could not be located. Counsel observed that Shelley's investigation commenced in September, but the case was not filed until November because, among other things, the investigation did not reveal any abuse or neglect of J.S.

¶ 31    The circuit court concluded that this was a case of anticipatory neglect, noting (a) the 2008 findings of abuse and neglect and the 2014 involuntary termination of parental rights, (b) the statements of J.S.'s siblings that Andre resided in the home and Andre's use of keys to enter the apartment, and (c) Andre's refusal to provide his address and his lack of cooperation with DCFS. The circuit court found Shelley to be credible and took judicial notice of the previous orders. The circuit court also noted that respondent "chose to leave" prior to the commencement of the adjudicatory hearing. On December 10, 2018, the circuit court entered an adjudication order finding J.S. was neglected based on an injurious environment.

¶ 32    During the dispositional hearing—which respondent did not attend—J.S.'s case manager testified that neither respondent nor Andre had participated in the integrated assessment for J.S.'s case. Respondent had completed parenting coaching services, was engaged in therapy, and consistently participated in supervised weekly visits with J.S. The case manager testified that DCFS recommended a goal of returning J.S. home within 12 months.

¶ 33    In a disposition order entered on May 2, 2019, J.S. was adjudged a ward of the court and respondent was found to be unable—and Andre was found to be unwilling and unable—for some reason other than financial circumstances alone to care for, protect, train, or discipline J.S. The permanency order included a 12-month return home goal and provided that respondent had made substantial progress toward J.S.'s return home. Respondent timely filed the instant appeal.

¶ 34                                    II. ANALYSIS
¶ 35                                A. Preliminary Issues
¶ 36        Prior to discussing respondent's contentions on appeal, we briefly address the timeliness of our decision. This case is designated as "accelerated" pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018) because it involves child custody matters. With respect to such cases, Rule 311(a)(5) provides, in part, that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). The 150-day period herein expired on October 25, 2019. We note, however, that the parties requested extensions of time for the filing of their respective briefs; respondent's reply brief was filed on December 11, 2019, and oral argument was held on December 19, 2019. Since the case was not ready for disposition until December 2019, we find good cause for issuing our decision after the 150-day deadline. *E.g.*, *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 37        Turning to the merits, respondent advances three primary arguments on appeal. First, she contends that the circuit court's finding of neglect was against the manifest weight of the evidence. Second, she argues that the circuit court erred in denying her motion for substitution of judge as of right. Third, she asserts that section 1-5(7) of the Juvenile Court Act denies parents the equal protection of the laws. The State and the public guardian challenge these contentions. Since any orders entered by the circuit court following the improper denial of the motion for substitution of judge are void (*Chavis v. Woodworker's Shop, Inc.*, 2018 IL App (3d) 170729, ¶ 15; *Aussieker v. City of Bloomington*, 355 Ill. App. 3d 498, 500 (2005)), we begin our analysis with respondent's challenges to the denial of her motion for substitution of judge and the constitutionality of section 1-5(7).

¶ 38                    B. Denial of Motion for Substitution of Judge
¶ 39                                1. General Principles
¶ 40        The substitution of a judge in civil and criminal cases in Illinois is governed solely by statute. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 26. As statutory construction presents a question of law, our review is *de novo*. *In re Estate of Wilson*, 238 Ill. 2d 519, 552 (2010).

¶ 41        A proceeding under the Juvenile Court Act is civil in nature. *In re C.M.*, 351 Ill. App. 3d 913, 916 (2004). In civil cases, section 2-1001 of the Code is divided into subsections that set forth the grounds under which substitution may be granted. *O'Brien*, 2011 IL 109039, ¶ 26.

¶ 42        Civil litigants are entitled to one substitution of judge without cause as a matter of right. *Cincinnati Insurance Co. v. Chapman*, 2012 IL App (1st) 111792, ¶ 23; 735 ILCS 5/2-1001(a)(2)(i) (West 2018). Section 2-1001(a)(2) provides, in pertinent part, that "[a]n application for substitution of judge as of right shall be made by motion and shall be granted if it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case." 735 ILCS 5/2-1001(a)(2)(ii) (West 2018).

¶ 43        A party must "timely" exercise the right to a substitution of judge without cause. *Id.* § 2-1001(a)(2). "The statute's requirement that the motion be timely is to prohibit litigants from 'judge shopping' by seeking a substitution after they have formed an opinion that the judge may be unfavorably disposed toward the merits of their case." *Petalino v. Williams*, 2016 IL App (1st) 151861, ¶ 18. "Accordingly, a motion for substitution of judge as of right must be (1) filed at the earliest practical moment before commencement of trial or hearing and

(2) before the trial judge considering the motion rules upon any 'substantial issue' in the case." *Id.* A ruling is "substantial" if it relates directly to the merits of the case. *Id.*; *Rodisch v. Commacho-Esparza*, 309 Ill. App. 3d 346, 350-51 (1999).

¶ 44 When properly made, a motion for substitution of judge as of right is absolute, and the circuit court has no discretion to deny the motion. *Bowman v. Ottney*, 2015 IL 119000, ¶ 17. Accordingly, our review of the denial of a motion for substitution of judge is *de novo*, and "such review should lean toward favoring rather than defeating a substitution of judge." *Petalino*, 2016 IL App (1st) 151861, ¶ 16.

¶ 45                              2. Applicability of Section 1-5(7) of the Juvenile Court Act

¶ 46 Prior to our analysis under section 2-1001(a)(2) of the Code, however, we must initially consider the applicability of section 1-5(7) of the Juvenile Court Act. Section 1-5(7) provides:

> "A party shall not be entitled to exercise the right to a substitution of a judge without cause under subdivision (a)(2) of Section 2-1001 of the Code of Civil Procedure in a proceeding under this Act if the judge is currently assigned to a proceeding involving the alleged abuse, neglect, or dependency of the minor's sibling or half sibling and that judge has made a substantive ruling in the proceeding involving the minor's sibling or half sibling." 705 ILCS 405/1-5(7) (West 2018).

Illinois courts appear to use "substantive" and "substantial" interchangeably, *i.e.*, a substantive ruling is one that directly related to the merits of the case. *In re Chelsea H.*, 2016 IL App (1st) 150560, ¶ 54. Since the arguments regarding section 1-5(7) involve issues of statutory construction, our review is *de novo*. *Wilson*, 238 Ill. 2d at 552.

¶ 47 We first consider whether Judge Geanopoulos was "currently assigned to a proceeding involving the alleged abuse, neglect, or dependency" of J.S.'s siblings. As of November 28, 2017—when the State filed a petition for adjudication of wardship as to J.S.—the circuit court was currently assigned to proceedings regarding three of J.S.'s siblings. Among other things, the court had continued respondent's motion to vacate guardianship to December 12, 2017. Respondent contends, however, that because she "merely sought a change in placement, when abuse or neglect issues has [*sic*] long ago been resolved," the proceedings on her motion did not involve the "alleged abuse, neglect, or dependency" of the three children. We disagree.

¶ 48 Her motion to vacate guardianship was filed as a "supplemental petition" under section 2-33 of the Juvenile Court Act. 705 ILCS 405/2-33 (West 2016). Section 2-33(1) provides that at any time prior to a minor's eighteenth birthday, the court may reinstate wardship and open a previously closed case when (1) wardship or guardianship under the Juvenile Court Act was vacated in conjunction with the appointment of a private guardian under the Probate Act of 1975, (2) the minor is not presently a ward of the court under article II of the Juvenile Court Act nor is there a petition for adjudication of wardship pending on behalf of the minor, and (3) it is in the minor's best interest that wardship be reinstated. *Id.* § 2-33(1). Once a section 2-33(1) petition is filed, the trial court has authority and jurisdiction to consider reinstating wardship. *In re L.W.*, 2018 IL App (3d) 170405, ¶ 13.

¶ 49 Respondent argues that her motion to vacate guardianship did not render section 2-1001 of the Code inapplicable because her motion did not involve the abuse, neglect, or dependency of Ca. S., Jal. S., and Ce. S. We do not read section 1-5(7) as narrowly as respondent suggests. In determining whether to reinstate wardship with respondent, the circuit court would necessarily

consider whether the issues that previously resulted in the findings of neglect had been addressed. See 705 ILCS 405/2-33(1) (West 2016) (providing that the trial court must consider whether it is in the minor's best interest that wardship be reinstated). We further note that section 2-33 is part of article II of the Juvenile Court Act, which concerns abused, neglected, and dependent children. See 705 ILCS 405/2-1 (West 2018).

¶ 50 Respondent also observes that the proceedings on her motion to vacate the guardianship with respect to her older children had already concluded at the time of her motion for substitution of judge in J.S.'s case, *i.e.*, her counsel withdrew the motion to vacate on December 12, 2017, and the motion for substitution of judge was filed on May 4, 2018. Since her substitution motion was filed after the conclusion of the proceedings regarding the motion to vacate, she contends that Judge Geanopoulos was not "currently assigned" to the siblings' proceedings. We reject this contention. Although she was informed of the November 28, 2017, hearing in J.S.'s case through a voicemail from Shelley, she did not attend that hearing or subsequent hearings in early 2018. The circuit court issued and repeatedly extended a child protection warrant based on a potential risk of harm to J.S. If we were to determine that section 1-5(7) was inapplicable under the circumstances herein, we would be condoning respondent's apparent decision to evade the court and abscond with her child while under DCFS investigation. See *Bowman*, 2015 IL 119000, ¶ 17 (providing that courts will avoid construing a statute in a manner which yields "absurd or unjust results"). We therefore conclude that Judge Geanopoulos was currently assigned to a proceeding involving the neglect of J.S.'s siblings for purposes of section 1-5(7).

¶ 51 We must next consider whether the judge had "made a substantive ruling" in the siblings' proceedings. 705 ILCS 405/1-5(7) (West 2018). The State and the public guardian correctly observe that the circuit court entered, among other things, adjudication and disposition orders with respect to Ca. S., Jal. S., and Ce. S. during the original proceedings that commenced in 2007. Such orders plainly constitute substantive rulings, *i.e.*, rulings directly related to the merits of the case. *Chelsea H.*, 2016 IL App (1st) 150560, ¶ 54.

¶ 52 As required by section 2-33(3) of the Juvenile Court Act, respondent filed the motion to vacate guardianship in the same cases in which the original adjudication orders were entered. 705 ILCS 405/2-33(3) (West 2016). Even if we determined that the 2017 proceedings on her motion constituted new proceedings—and we solely considered the court's rulings during that time period—we would nevertheless conclude that Judge Geanopoulos made substantive rulings regarding J.S.'s siblings. For example, during a hearing on September 7, 2017, Judge Geanopoulos stated on the record that he had held an "extensive [attorneys] only conference" regarding respondent's motion to vacate guardianship. The judge stated that he anticipated that "everything is going to go fine" and the three children would soon be returned to respondent's full legal custody but indicated that he wanted a written report on the status of the children to ensure "no glaring issues" involving respondent. By discussing issues with the parties' attorneys and indicating his position thereon, Judge Geanopoulos made a substantive ruling in the siblings' proceedings in 2017. See, *e.g.*, *Colagrossi v. Royal Bank of Scotland*, 2016 IL App (1st) 142216, ¶ 30 (noting that examples of rulings on substantial issues include situations "where the party moving for a substitution of judge has discussed issues with the trial judge, who then indicates a position on a particular point").

¶ 53 For the foregoing reasons, we find that circuit court correctly decided that section 1-5(7) of the Juvenile Court Act prevented respondent from exercising her right to a substitution of

judge as of right in J.S.'s case. Furthermore, even if we were to find that section 1-5(7) did not apply in this case, we would nevertheless conclude that the circuit court properly denied the substitution motion under section 2-1001 of the Code.

¶ 54                                 3. Section 2-1001 of the Code

¶ 55     A motion for substitution of judge as of right "shall be granted if it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case." 735 ILCS 5/2-1001(a)(2)(ii) (West 2018). As discussed below, we find that the issuance and multiple extensions of the child protection warrant in the instant case constituted rulings on a substantial issue, and thus the denial of the substitution motion was proper.

¶ 56     Judge Geanopoulos entered a temporary custody hearing order and issued a child protection warrant directing the return of J.S. on November 28, 2017. Although the transcripts of the hearings in early 2018 are not included in the record on appeal, the written orders from that time period reflect that the circuit court extended the warrant and directed law enforcement to appear and report on the efforts made to locate J.S.

¶ 57     According to respondent, the child protection warrant "was only about the child's whereabouts and not the merits of the abuse or neglect." We are unpersuaded by this contention. The motion for temporary custody stated that there was an immediate and urgent necessity to take J.S. into temporary custody because, in part, the "parents refused to cooperate with DCFS personnel and locked the current investigator out of the family's apartment" and "DCFS has been unable to assess the safety of this minor while in the parent's care since November 17, 2017." In other words, respondent's possible abscondment with J.S. was itself one of the bases for the requested relief. The circuit court issued the child protection warrant and entered the temporary custody hearing order based on, among other things, Shelley's testimony regarding a potential risk of harm to J.S. due to the past domestic violence between respondent and Andre. When granting such relief, the circuit court did not merely enter a procedural order regarding the mechanics of the case. *E.g.*, *In re Marriage of Crecos*, 2015 IL App (1st) 132756, ¶ 26 (finding that an order which sets a briefing schedule or a hearing date is not a substantial ruling). The circuit court instead considered whether J.S. was at risk of harm—a question that is directly related to the merits of this neglect case. *Petalino*, 2016 IL App (1st) 151861, ¶ 18 (noting that a ruling is substantial if it directly relates to the merits of the case).

¶ 58     Respondent argues that the temporary custody hearing order herein was akin to a ruling in a probable cause hearing in a criminal case and should not be deemed a substantive ruling for purposes of section 2-1001 under the rationale set forth in *In re Austin D.*, 358 Ill. App. 3d 277, 282-83 (2005). The *Austin D.* court found that the trial court's shelter-care order—like probable cause findings in certain cases—was not a substantive ruling directly related to the merits of the case and therefore the motion to substitute judge should have been granted. *Id.* at 286. We observe, however, that a key factor in *Austin D.* was that the trial court had appointed counsel for the mother but then proceeded to the hearing without counsel present due to the time constraints for holding a shelter-care hearing under the Juvenile Court Act. *Id.* at 285. The appellate court specifically stated: "We do not hold that the temporary-custody order can never be a substantive ruling. In many cases, it may be a substantive ruling." *Id.* at 285-86. For the

- 10 -

reasons discussed above, we find that the temporary custody hearing order and child protection warrant herein were substantive rulings.

¶ 59 Section 2-1001(a)(2)(iii) of the Code provides that

"[i]f any party has not entered an appearance in the case and has not been found in default, rulings in the case by the judge on any substantial issue before the party's appearance shall not be grounds for denying an otherwise timely application for substitution of judge as of right by the party." 735 ILCS 5/2-1001(a)(2)(iii) (West 2018).

According to respondent, "any arguably substantive ruling would not bar substitution of judge under [section 2-1001] since the ruling would have preceded May 4, 2018, when the mother first appeared and [counsel] was appointed." We disagree. Although our review should lean toward favoring rather than defeating a substitution of judge (*Petalino*, 2016 IL App (1st) 151861, ¶ 16), we reject the proposition that respondent's own purposeful avoidance of the court's reach would serve as an underpinning for her substitution motion. We further find that her application was not "otherwise timely" for purposes of section 2-1001. A motion for substitution of judge as of right must be filed at the "earliest practical moment" before the commencement of the trial or hearing. *Id.* ¶ 18. Under the circumstances herein, we cannot find that the substitution motion was filed at the "earliest practical moment."

¶ 60 We further note that "even if the trial court did not rule on a substantial issue, a motion for substitution of judge as of right may still be denied if, before filing the motion, the moving party had an opportunity to test the waters and form an opinion as to the court's disposition toward his claim." *In re Estate of Hoellen*, 367 Ill. App. 3d 240, 246 (2006). The "testing the waters" doctrine restrains litigants from seeking a substitution after discovering the judge's view on a contested issue in the case. *Colagrossi*, 2016 IL App (1st) 142216, ¶ 39. In the instant case, by issuing and extending the child protection warrant and by ordering law enforcement to appear and explain their efforts to locate J.S., Judge Geanopoulos arguably "tipped his hand" (see *id.*) regarding his potentially unfavorable view of J.S.'s care and environment. Although we recognize the split among the judicial districts in Illinois regarding the continued viability of the testing the waters doctrine, the doctrine remains viable in the First District. See *In re Petition to Annex Certain Territory to the Village of Lemont*, 2017 IL App (1st) 170941, ¶¶ 13-14.

¶ 61 For the foregoing reasons, we conclude that even if section 1-5(7) of the Juvenile Court Act did not prevent respondent from seeking substitution of judge as of right, the requirements of section 2-1001(a)(2) of the Code were not otherwise satisfied and thus the circuit court did not err in its denial of the substitution motion.

¶ 62 C. Constitutionality of Section 1-5(7) of the Juvenile Court Act

¶ 63 Respondent next contends that the application of section 1-5(7) of the Juvenile Court Act denies parents the equal protection of the laws. She asserts that "[u]nder the Adoption Act, which governs a similar category of proceedings involving the care and custody of minors, a substitution of judge can be obtained even if there is another sibling with a pending case before the same judge, as the Adoption Act contains no provision analogous to [section] 1-5(7)." The State and public guardian argue that respondent's equal protection challenge is unavailing.

¶ 64 Statutes are presumed to be constitutional. *In re R.C.*, 195 Ill. 2d 291, 296 (2001). Respondent, as the party challenging the constitutionality of section 1-5(7), bears the burden of rebutting the presumption of constitutionality and clearly establishing a constitutional violation. *Id.* The constitutionality of a statute is a question of law that we review *de novo*. *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 227 (2010). We must construe statutes so as to affirm their validity and constitutionality if we can reasonably do so. *R.C.*, 195 Ill. 2d at 296.

¶ 65 In the instant case, however, we need not address the constitutionality of section 1-5(7). As discussed above, even if section 1-5(7) were inapplicable, we nevertheless conclude that the circuit court properly denied respondent's motion for substitution for judge as of right pursuant to section 2-1001(a)(2) of the Code. Our supreme court has repeatedly admonished that cases should be decided on nonconstitutional grounds wherever possible, reaching constitutional issues only as a last resort. *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 286 (2009); *In re E.H.*, 224 Ill. 2d 172, 178 (2006); see also *Vasquez Gonzalez v. Union Health Service, Inc.*, 2018 IL 123025, ¶ 19 (stating that "[i]mprovident or unnecessary declarations that a statutory enactment is constitutionally infirm compromise the stability of our legal system"). Constitutional issues should be addressed only if necessary to decide a case. *The Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 34. Because we can decide this case based on respondent's failure to satisfy the requirements of section 2-1001(a)(2) for substitution of judge as of right, we need not address the constitutionality of section 1-5(7) of the Juvenile Court Act. We thus turn to the key issue on appeal, *i.e.*, whether the finding of neglect was erroneous.

¶ 66                              D. Circuit Court's Finding of Neglect

¶ 67 Respondent argues that the circuit court's finding of neglect was against the manifest weight of the evidence; the State and the public guardian contend that the circuit court properly found that J.S. was neglected due to an injurious environment. For the reasons discussed below, we conclude that the neglect finding was not against the manifest weight of the evidence.

¶ 68 The purpose of the Juvenile Court Act is to ensure the best interests and safety of the child. *In re Arthur H.*, 212 Ill. 2d 441, 467 (2004); accord *In re A.P.*, 2012 IL 113875, ¶ 18 (noting that in any proceeding under the Juvenile Court Act, including an adjudication of wardship, the paramount consideration is the best interest of the child). The Juvenile Court Act "provides the procedures that must be followed for determining whether a minor should be removed from his or her parents' custody and made a ward of the court." *A.P.*, 2012 IL 113875, ¶ 18.

¶ 69 A trial court must employ a two-step process to decide whether a minor should become a ward of the court. *Id.* The first step is an adjudicatory hearing on the petition for adjudication of wardship. *Id.* ¶ 19. At the adjudicatory hearing, the trial court solely considers the question of whether the minor is abused, neglected, or dependent. *Id.*; see also 705 ILCS 405/2-18(1) (West 2018); *Arthur H.*, 212 Ill. 2d at 467 (noting that "the only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful"). If the trial court determines that a minor is abused, neglected, or dependent, then the trial court proceeds to the second step, which is the dispositional hearing. *A.P.*, 2012 IL 113875, ¶ 21. "At the dispositional hearing, the trial court determines whether it is consistent with the health, safety and best interests of the minor and the public that the minor be made a

ward of the court." *Id.* In the instant case, respondent challenges the findings in the adjudication order, not the disposition order.

¶ 70    Cases involving neglect are *sui generis* and must be decided based on their unique circumstances. *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29. The State bears the burden to prove allegations of neglect by a preponderance of the evidence, meaning that the State must establish that the allegations are more probably true than not. *A.P.*, 2012 IL 113875, ¶ 17. If the State fails to prove the allegations of neglect, the trial court must dismiss the petition. *Arthur H.*, 212 Ill. 2d at 464. On review, the trial court's finding of neglect will not be reversed unless it is against the manifest weight of the evidence, *i.e.*, only if the opposite conclusion is clearly evident. *A.P.*, 2012 IL 113875, ¶ 17.

¶ 71    A neglected minor includes "any minor under 18 years of age *** whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2018). The term "injurious environment" generally has been interpreted to include the breach of a parent's duty to ensure a nurturing and safe shelter for her children. *A.P.*, 2012 IL 113875, ¶ 22. The adjudication order found that J.S. was neglected based on an injurious environment.

¶ 72    In any hearing under the Juvenile Court Act, proof of the abuse, neglect, or dependency of one minor is admissible evidence on the issue of the abuse, neglect, or dependency of any other minor for whom the respondent is responsible. 705 ILCS 405/2-18(3) (West 2018); see also *C.M.*, 351 Ill. App. 3d at 916 (providing that a "parent's behavior toward one minor may be considered when deciding whether a sibling is exposed to an injurious environment"). While sibling abuse may be *prima facie* evidence of neglect based on an injurious environment, this presumption is not permanent; the presumption weakens over time and can be rebutted by the introduction of other evidence. *In re J.P.*, 331 Ill. App. 3d 220, 235 (2002); accord *In re Edricka C.*, 276 Ill. App. 3d 18, 28 (1995).

¶ 73    The circuit court in the instant case found that J.S. was neglected under a theory of anticipatory neglect.

>    "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *Arthur H.*, 212 Ill. 2d at 468.

See also *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 34 (noting that the anticipatory neglect doctrine recognizes that a parent's treatment of one child is probative of how that parent may treat his or her other children). A trial court presented with evidence of prior neglect by a parent should not be forced to refrain from acting until another child is injured. *In re Kenneth D.*, 364 Ill. App. 3d 797, 801 (2006). However, there is no *per se* rule of anticipatory neglect in Illinois, and each case must be reviewed according to its own facts. *Arthur H.*, 212 Ill. 2d at 468-69; *J.P.*, 331 Ill. App. 3d at 235.

¶ 74    The evidence herein supports the circuit court's finding of anticipatory neglect. In adjudication orders entered in 2008, five of respondent's older children were found to be neglected based on head trauma inflicted on Jak. S. The adjudication orders found that the abuse or neglect was inflicted by a parent. Respondent's parental rights as to her sixth child (A.S.) were involuntarily terminated in September 2014 based, in part, on her desertion of the

child for at least three months before the termination proceedings.[3] Although "a lengthy period of time between allegations of neglect or abuse, without evidence of current conditions of the current child's neglect or abuse" may be insufficient to prove anticipatory neglect (*In re J.C.*, 396 Ill. App. 3d 1050, 1058 (2009)), the circuit court appears to have appropriately considered the nature and timing of the prior allegations. The record also reflects that respondent did not complete the recommended services in conjunction with her older children's cases.

¶ 75 Furthermore, it is evident from the circuit court's findings that its determination of neglect was not exclusively premised on the past findings as to J.S.'s siblings. *E.g.*, *J.P.*, 331 Ill. App. 3d at 235 (noting that the court's determination of neglect was premised upon consideration of the minor's current condition and care, not solely the past finding of neglect as to the minor's sibling). The testimony suggested that Andre and respondent—who had a history of domestic violence—lived together with J.S. Shelley initially encountered Andre in the apartment alone and subsequently witnessed Andre opening the apartment door with keys, and Cornett testified that the three older children indicated that Andre and respondent shared an apartment. Respondent's children Ca. S. and Ce. S. provided corroborating statements that Andre smashed their cell phones—an incident which, regardless of whether J.S. was present, appears relevant to an assessment of J.S.'s environment. See, *e.g.*, *In re A.W.*, 231 Ill. 2d 241, 256 (2008) (noting that "in cases in which parental anger is the basis for a finding of an injurious environment, evidence of parental anger and hostility in the presence, as well as outside the presence, of the children is admissible if it is relevant, and the determination of its relevancy is within the sound discretion of the circuit court").

¶ 76 The circuit court also noted that Andre had an "outburst" during Shelley's visit—where J.S. was present—and that Andre had persuaded respondent not to participate in intact services and a care plan proposed by DCFS. See, *e.g.*, *In re Adam B.*, 2016 IL App (1st) 152037, ¶ 52 (finding that the respondent's noncompliance with recommended intact services, her refusal to allow a safety assessment of her home, and her failure to assist the DCFS investigator to procure medical care for the minors constituted evidence of abuse and neglect). While we recognize that respondent's case manager testified during the dispositional hearing that she had completed parenting coaching services and was engaged in therapy, such efforts did not " 'somehow absolve or erase [her] initial failing that triggered State intervention and removal of the child.' " *In re S.W.*, 342 Ill. App. 3d 445, 451 (2003) (quoting *In re C.W.*, 199 Ill. 2d 198, 217 (2002)).

¶ 77 As noted above, the best interests of the child are paramount in child custody proceedings under the Juvenile Court Act, and a trial court is afforded "broad discretion and great deference" in matters involving minors. *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). Although the evidence suggested that J.S. was a healthy and nourished child who had not been physically injured, such evidence does not preclude a finding of neglect. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 39. The record reflects that the court considered both the past findings of neglect with respect to the older siblings and J.S.'s current condition and care in its determination that J.S. was a neglected minor due to an injurious environment. After careful consideration of the totality of the evidence, we conclude that the finding of neglect was not against the manifest weight of the evidence.

---

[3]Given J.S.'s birthdate of April 1, 2015, respondent presumably was pregnant with J.S. at the time her parental rights as to A.S. were terminated.

¶ 78                            III. CONCLUSION

¶ 79      For the reasons set forth herein, the judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 80      Affirmed.