2023 IL App (1st) 221354-U

FIRST DISTRICT,
FIRST DIVISION
April 24, 2023

No. 1-22-1354

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* M.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County, Illinois |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Juvenile Justice and |
| | ) | Child Protection Department, |
| Petitioner-Appellee, | ) | Child Protection Division. |
| | ) | |
| v. | ) | No. 21 JA 00668 |
| | ) | |
| M.W., | ) | The Honorable |
| | ) | Andrea M. Buford, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justices Pucinski and Hyman concurred in the judgment.

**ORDER**

¶ 1     *Held*: Trial court's adjudication of minor as neglected under theory of anticipatory neglect is affirmed where respondent abused and neglected minor's sibling and was noncompliant with reunification services. Respondent waived challenge to disposition where she requested finding that she was unable to care for minor.

¶ 2     Respondent M.W. appeals from the trial court's adjudication order finding her minor son

M.D. neglected due to an injurious environment under a theory of anticipatory neglect, and its

disposition order finding respondent unable to care for M.D. and adjudging him a ward of the court.[1] For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        M.D. was born on July 9, 2021 and taken into protective custody on July 15, 2021. On July 16, 2021, the State filed a petition for adjudication of wardship and moved for temporary custody of M.D., alleging neglect due to an injurious environment and abuse due to substantial risk of physical injury (705 ILCS 405/2-3(1), (2) (West 2020)). The petition alleged:

> "Mother has three prior indicated reports for bone fractures by abuse, medical neglect, head injuries by abuse, inadequate food, failure to thrive and substantial risk of physical injury/environment injurious to health/welfare by neglect. Mother has one minor not in her care and two other minors who were in custody of Indiana Department of Child Services with findings have been entered. Mother has one other minor who is in DCFS custody with findings of abuse, neglect and physical abuse having been entered. Mother has been noncompliant with offered and recommended services. Mother has untreated mental health issues. Putative father's identity and whereabouts are unknown. Paternity has not been established."

Following a hearing on July 19, 2021, the trial court granted temporary custody of M.D. to the Illinois Department of Children and Family Services (DCFS) Guardianship Administrator.

¶ 5                              Adjudicatory Hearing

¶ 6        At M.D.'s adjudicatory hearing on April 11, 2022, the State introduced a May 18, 2015 adjudication order, finding M.D.'s sibling L.W. abused and neglected based on lack of care, injurious environment, physical abuse, and substantial risk/physical injury. Specifically, the court

---

[1] M.D.'s father is unknown, and an order of default was entered on December 16, 2021.

found that L.W. sustained a subdural hematoma and retinal hemorrhages in M.W.'s care. M.W. did not seek medical care for L.W. and "did not adequately feed" her. The court found that this abuse and neglect was "inflicted by" M.W. The court also found that M.W. "has bipolar [disorder] and has not taken medication since age 14." The State also introduced L.W.'s July 15, 2015 disposition order finding M.W. unable to care for L.W., adjudging L.W. a ward of the court, and appointing the DCFS Guardianship Administrator as her guardian.

¶ 7        The State introduced a June 3, 2021 Family Service Plan, indicating that in November 2014, M.W. and L.W.'s putative father brought L.W. to the hospital for shortness of breath. L.W. was three months old and weighed only seven pounds. She had "two fractured ribs in multiple stages of healing." Her parents claimed that she fell off the bed and that they accidentally dropped her, but they did not seek medical treatment for either incident. L.W. would throw up everything she ate, missed checkups, and was not up to date on immunizations. Her parents did not have diapers and could not afford to take her to the doctor. L.W. was eventually diagnosed with shaken baby syndrome. At the age of six years old, L.W. was nonverbal and required assistance with basic life skills, including bathing, toileting, and feeding. She took medicine to prevent seizures, required one-on-one aid in school, and received physical, occupational, and speech therapy. The Family Service Plan also indicates that M.W. was "referred to services," which "she failed to participate or complete" and that M.W. gave birth to another child in July 2015, who was "taken into the custody of DCFS in the state of Indiana at the time of birth."

¶ 8        The parties stipulated that temporary custody of L.W. was taken on December 9, 2014. On March 24, 2015, M.W. signed specific consents for the adoption of L.W., which were voided in March 2021 when her foster placement changed. On May 21, 2021, M.W. signed new specific consents. M.W. gave birth to M.D. on July 9, 2021.

¶ 9        The parties further stipulated to the testimony of Tiara Long and Taisha Bowen. Long was the DCFS Child Protection Investigator assigned to investigate "an E Sequence allegation involving the minor [M.D.]" on July 10, 2021. Long discovered that M.W. had "three prior indicated reports for bone fractures by abuse, medical neglect, head injuries by abuse, inadequate food, failure to thrive and substantial risk of physical injury/environment injurious to health/welfare by neglect." On July 10, 2021, Long spoke with M.W. at St. Anthony Hospital. M.W. stated that she is not participating in services "because her daughter's case has been closed due to adoption"; that she has one child in the care of her aunt and two others that were adopted in Indiana; and that M.D.'s father was abusive toward her, so she "chose not to be involved with him."

¶ 10        Taisha Bowen, a former Lawrence Hall Youth Services caseworker, was assigned to M.W.'s minor children in November 2020. At the time of M.D.'s birth, L.W.'s case "remained open and court-involved." M.W. "was recommended to engage in reunification services for the minor [L.W.], including mental health services, but *** did not complete those services."

¶ 11        The trial court found that M.D. was neglected due to an "injurious environment only," noting that M.W "had [another] infant who suffered multiple fractured ribs." The court noted M.W.'s three prior indicated reports, the fact that two of her children had been adopted and that one was in the care of another person. Since M.W. had "failed to complete services with respect to her other children" or  "correct conditions," the court was unwilling to leave "another infant" in her care. M.W. made a statement following the court's ruling, indicating that her ex-boyfriend, Richard, beat her and L.W., and that he was responsible for L.W.'s "conditions."

¶ 12                                Dispositional Hearing

¶ 13     M.D.'s dispositional hearing was held on August 11, 2022. Lawrence Hall caseworker Nyla Clay testified that M.D. is placed in a traditional foster home that is safe and appropriate with no signs of abuse or neglect. M.W. was assessed for services and was determined to need random drops, domestic violence and parenting classes, and a substance abuse assessment. Both requested drops were negative. M.W. started individual therapy, was referred for a substance abuse assessment, and completed a parenting class in December 2021. M.W. told Clay that she had completed a domestic violence class but had not yet provided a certificate of completion. M.W. has "appropriate" supervised visits with M.D. twice per week. She feeds and plays with M.D., she sometimes "says things that aren't true or correct ***" (*i.e.,* getting "his age wrong and his abilities"), but there are no safety concerns. A Parenting Capacity Assessment (PCA) conducted by clinical psychologist Michelle L. Iyamah found that M.W. could not meet "minimal parenting standards in order to parent" M.D. In Clay's opinion, it was in M.D.'s best interest to be adjudged a ward of the court.

¶ 14     The State introduced an Integrated Assessment (IA), incorporating IA interviews with M.W. from both January 2015 and August 2021. The IA describes M.W.'s own childhood involvement with DCFS and her personal experiences of physical and sexual abuse, domestic violence, mental health issues, and substance abuse. M.W. had been "diagnosed with mild to moderate cognitive impairment," bipolar disorder, and major depressive disorder. The IA indicates that M.W. has "a history of mental illness, suicidal ideation, and self-harm."

¶ 15     M.W. denied abusing L.W., maintaining that her "paramour at the time, Richard," was "extremely abusive towards her and [L.W.]" M.W. gave birth to three other children prior to M.D.—E.L. (born August 15, 2015), R.L. (born September 10, 2016), and Mi.D. (born September 1, 2017). Richard was the father of both E.L. and R.L. The state of Indiana removed

E.L. from M.W.'s care after E.L. tested positive for marijuana at birth. M.W. and Richard were "not caring for [E.L.] at the hospital" and could not afford diapers, formula, a crib, or transportation home from the hospital. When R.L. was born, there were concerns over M.W.'s "ability to care for [R.L.] due to issues of domestic violence, [M.W.'s] cognitive ability, and [R.L.'s] father's repeated urine screens that were positive for marijuana." The state of Indiana took protective custody of R.L. after M.W. fled the state with her. E.L. and R.L. were adopted by different families in Indiana. Mi.D. was "determined to be at significant risk of harm" due to M.W.'s prior indicated reports. M.W. consented to her aunt serving as Mi.D.'s guardian.

¶ 16      Frank, a man she was seeing during her pregnancies with Mi.D. and M.D., "kicked her in the stomach while she was pregnant with [Mi.D.]," and "struck her and strangled her" after Mi.D.'s birth. Frank also "stabbed her, struck her, and strangled her" while she was pregnant with M.D. Another man, Michael, "stabbed her and struck her while she was pregnant with [M.D.]" M.W. denied the presence of domestic violence in her current relationship.

¶ 17      M.W. admitted that she "continued to smoke marijuana until she was 5, 6, or 7 months pregnant" with M.D. because she was "under stress and felt depressed." At the time of M.D.'s birth, M.W. had an open DCFS case due to the abuse of L.W., was noncompliant with services, did not have any of her four older children in her care, and had a history of mental illness, suicidal ideation, and self-harm.

¶ 18      The IA clinical screener found that M.W. "continued to demonstrate difficulty in providing safety for her children." During the "6 1/2 years between IA interviews, [M.W.] did not participate in individual therapy, she has not yet examined and addressed her childhood trauma *** " and has "continued to engage in domestically violent relationships," placing both herself and her unborn children in danger. M.W.'s ability to provide M.D. "with a safe

environment that is free of violence is in question." M.W. has "spent very little time parenting any of her children"—she "failed to successfully complete reunification services for her 3 oldest children" and agreed to guardianship of Mi.D. Based on M.W.'s cognitive delay, which "may significantly impact her ability to parent," and the "termination of her parental rights towards her 3 oldest children," the screener did not recommend "return home."

¶ 19       The State also introduced Dr. Iyamah's July 4, 2022 PCA report. The report reflects that M.W. has a "history of learning concerns, intellectual deficits, mental illness, especially chaotic and highly abusive childhood, as well as [being a] victim of relational violence as an adult and loss of children." Dr. Iyamah concluded that M.W. fails to meet "minimal parenting standards" due to her weak intellectual functioning, poor judgment, and significant history of "poor parenting."

¶ 20       The State and Public Guardian jointly requested that the court adjudge M.D. a ward of the court, find M.W. "unable only at this time," and enter a permanency goal of "return home pending status." M.W.'s counsel asked the court to "find that [M.W.] is unable only and *** enter a goal of return home 12," arguing that M.W. "is either done or is participating in every service that has been made available to her." Counsel also asserted that the PCA is "concerning" due to "biases that were clearly exhibited by the service provider" against low-income families and domestic violence survivors.

¶ 21       The trial court adjudged M.D. a ward of the court, found M.W. unable to care for, protect, train, or discipline M.D., and appointed the DCFS Guardianship Administrator to serve as his guardian. With respect to the permanency goal, the trial court noted that it had "not reviewed the parenting capacity assessment yet," so it did not know whether "the provider [was]

doing a recitation of the facts or if she is indeed showing a bias." However, it was "the only one [it had] to rely on." The court entered a permanency goal of "return home pending status."

¶ 22                                                      ANALYSIS

¶ 23        The Juvenile Court Act (705 ILCS 405/w *et seq.* (West 2020)) establishes the process by which a minor may be removed from his or her parents' care and made a ward of the court. Upon the filing of a petition for wardship by the State, a temporary custody hearing is held to determine whether there is probable cause to believe that the minor is abused or neglected. 705 ILCS 405/2-10(1)-(2) (West 2020). The court then holds an adjudicatory hearing to determine whether a preponderance of the evidence shows that the minor is abused or neglected. 705 ILCS 405/1-3(1) (West 2020). Following such a finding, a dispositional hearing is held to determine "whether it is in the best interests of the minor *** that he be made a ward of the court." 705 ILCS 405/2-22(1) (West 2020).

¶ 24        A "neglected" minor is "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2020). Both "neglect" and "injurious environment" are fluid terms. *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). " '[Neglect] embraces wilful as well as unintentional disregard of duty. *** It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes.' " *In re N.B.*, 191 Ill. 2d 338, 346 (2000) (quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). "Injurious environment" is "an amorphous concept that cannot be defined with particularity, but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for her children." (Internal quotation marks omitted.) *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 28.

¶ 25    M.D. was found neglected under a theory of anticipatory neglect, where "the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *Arthur H.*, 212 Ill. 2d at 468. While the neglect of one child does not conclusively establish neglect of another, "proof of neglect of one minor 'shall be admissible evidence' on the issue of neglect of any other minor for whom the parent is responsible." *Id.* (citing 705 ILCS 405/2-18(3) (West 2020) and *In re S.R.*, 349 Ill. App. 3d 1017, 1021 (2004)). The court should consider both the circumstances surrounding the sibling as well as the current care and condition of the child in question. *Id.* at 468. Each case must be reviewed "according to its own facts." *In re Edricka C.*, 276 Ill. App. 3d 18, 31 (1995)).

¶ 26    The trial court's finding of neglect will ordinarily not be disturbed unless it is against the manifest weight of the evidence. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 27. However, where, as here, the ruling was based on "a stipulated record and not based upon any observations of the witnesses or witness's testimony," our review is *de novo*. *Id.* ¶ 38.

¶ 27    The State must prove neglect by a preponderance of the evidence, meaning "the allegations of neglect *** are more probably true than not." *Id.* ¶ 23. M.W. asserts that the State failed to meet its burden because the trial court "focus[ed] solely on the minor's sibling, L.W., without having any independent facts that M.D. had been abused or neglected."

¶ 28    In addition to M.W.'s past neglect and abuse of L.W., the State relied on M.W.'s failure to address the underlying conditions leading to that abuse and neglect. The stipulated evidence showed that M.W. had "three prior indicated reports for bone fractures by abuse, medical neglect, head injuries by abuse, inadequate food, failure to thrive and substantial risk of physical

injury/environment injurious to health/welfare by neglect." L.W. suffered abuse and neglect inflicted by M.W., resulting in severe physical injuries and long-term effects that continue to impact L.W.'s daily life. At the time of M.D.'s birth, L.W.'s case remained open; M.W.'s three other minor children were not in her care; and M.W. had been recommended services, which she did not complete.

¶ 29    "[T]he court need not wait for another infant *** to be neglected in the same manner before finding him neglected under a theory of anticipatory neglect." *In re J.C.*, 396 Ill. App. 3d 1050, 1058 (2009). Under these facts, the State met its burden of showing that it was "more probably true than not" that M.W. could not provide M.D. with a "safe and nurturing shelter." (Internal quotation marks omitted.) *Arthur H.*, 212 Ill. 2d at 463-64; see, *e.g.*, *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 54 (evidence of anticipatory neglect sufficient where mother engaged in "sporadic" services and had "longstanding mental health issues and parenting deficiencies, on which [mother] failed to ever make progress"); *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 45 (finding sufficient evidence of anticipatory neglect where mother's participation in services was inconsistent and "superficial," three minors were removed from her custody, and the return home goal for siblings was changed to termination of parental rights).

¶ 30    Relying on *Arthur H.* and *Edricka C.*, M.W. argues that the State failed to show that M.D. was neglected. In *Arthur H.*, 212 Ill. 2d at 449-50, four minors were removed from their mother's custody because she failed to provide necessary medical care for one minor. *Id.* at 444. The minors were also found wearing clothes that smelled of urine and drinking curdled milk. *Id.* at 445. The trial court *sua sponte* directed the State to file a neglect petition for Arthur H. *Id.* at 446. Our supreme court held that the State failed to show that Arthur H. was neglected where: his primary residence was with his father in a different state; his father was his primary

caretaker; and he was not present for the incidents that formed the basis of the petition. *Id.* at 472, 476-77. Here, if the State had not taken custody of M.D., he would have been in the care and custody of M.W., who not only severely abused and neglected L.W., but also failed to engage in any services to correct the conditions leading to that abuse and neglect.

¶ 31     *Edricka C.*, 276 Ill. App. 3d at 30, is also distinguishable. There, the State advanced a "*per se* rule of anticipatory neglect," arguing that minors Edricka and Zemaj (born in 1991 and 1992, respectively) were neglected because one of their siblings was beaten by their mother in 1987 and other siblings were left unsupervised in 1989. *Id.* However, Edricka and Zemaj lived with their mother "without incident" and, unlike M.W., their mother participated in counseling, domestic violence classes, and drug and alcohol assessments. *Id.* at 29-30.

¶ 32     Relying on *In re D.A.*, 2022 IL App (2d) 210676, ¶ 21, M.W. further asserts that the period of time between L.W.'s neglect and M.D.'s birth warrants reversal. In *D.A.*, the evidence of neglect was limited to "factual allegations of past events and adjudications involving respondent's previous children," which occurred between two to five years before D.A.'s birth. *Id.* ¶¶ 8, 19. The remaining evidence showed that D.A. was "cared for and healthy." *Id.* at ¶ 21. In contrast, the time between L.W.'s neglect and M.D.'s birth in this case does not negate that M.W. was noncompliant with reunification services, including mental health services, and lost custody of her three other children during that same time period. See, *e.g.*, *In re J.S.*, 2020 IL App (1st) 191119, ¶¶ 74, 75 (minor's siblings' neglect over six years before his birth showed anticipatory neglect where "respondent did not complete the recommended services in conjunction with her older children's cases" and the State did not rely "exclusively" on neglect of siblings).

¶ 33    M.W. also argues that the trial court's ruling that M.W. was unable to care for M.D. is against the manifest weight of the evidence. "[A] party is estopped from taking a position on appeal that is inconsistent with a position the party took in the trial court." *In re William H.*, 407 Ill. App. 3d 858, 870 (2011). In addition, "[i]n order to preserve a question for review, a party must make an appropriate objection in the court below, and failure to object constitutes a waiver." *In re Lakita B.*, 297 Ill. App. 3d 985, 991 (1998). Because M.W. explicitly requested that the court find her "unable only," she has waived this argument on appeal. See *id.* at 991-92 (respondent's concession that she was "unable" resulted in waiver of the issue on appeal); see also *In re M.D.*, 2021 IL App (1st) 210595, ¶ 22 (respondent "invited the error she now complains of" by requesting that the court find the minor neglected).

¶ 34    In any event, the trial court's finding that M.W. was unable to care for M.D. is not against the manifest weight of the evidence. See *In re April C.*, 326 Ill. App. 3d 245, 257 (2001) (disposition order will be reversed only if it is against the manifest weight of the evidence). The trial court can make a minor a ward of the court if it determines that a parent is "unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor, *** and that the health, safety and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27 (West 2020).

¶ 35    The IA outlines how M.W. lost custody of all her minor children. Further, M.W. has unaddressed mental health issues and trauma, and a history of domestically violent relationships placing herself and her children in danger. The IA clinical screener concluded that M.W. could not provide a safe environment for M.D. and that she had spent very little time actually parenting her children. "Return home" was not recommended due to M.W.'s cognitive delay and the termination of her parental rights to her three eldest children. This evidence alone supports the

- 12 -

trial court's finding that M.W. was unable to care for M.D. and that it was in his best interest to be adjudged a ward of the court.

¶ 36     Finally, M.W. argues that the trial court "abused its discretion when entering the disposition order based on unreliable evidence that was never reviewed by the court." Specifically, she asserts Dr. Iyamah's PCA report shows bias against low-income individuals and domestic violence survivors. As discussed above, the IA alone supports the trial court's ruling. Moreover, M.W. only challenged the PCA as it related to the permanency goal, not the trial court's disposition finding M.W. unable to care for M.D.

¶ 37                                    CONCLUSION

¶ 38     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 39     Affirmed.