No. 2-21-0706
Opinion filed August 2, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| ENEYA KATSAP, | ) | of Du Page County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 20-D-811 |
| | ) | |
| ALEXANDER KATSAP, | ) | Honorable |
| | ) | Neal W. Cerne, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hudson and Brennan concurred in the judgment and opinion.

**OPINION**

¶ 1    Petitioner, Eneya Katsap, appeals from the trial court's entry of a judgment of dissolution

of her marriage (JDOM) to respondent, Alexander Katsap. We affirm in part, reverse in part, vacate

in part, and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3                                    A. The Parties

¶ 4    Eneya and Alexander were both born in Russia. At the time of trial in 2021, Eneya was 39

years old, and Alexander was 43 years old. They were married in Israel on March 4, 2010. One

minor child, E.K., was born to the parties in the United States by surrogacy on January 28, 2019.

Because Eneya was unable to carry a child to term, the parties created frozen embryos, which are

stored at the New England Fertility Institute in Connecticut. The parties also created an escrow account for maintenance of the embryos. Approximately $6000 is in that escrow account.

¶ 5 Prior to April 2020, the parties resided in upstate New York. They formed and co-owned a business known as Alex Solutions, Inc. (Alex Solutions), which sold, installed, and repaired commercial and residential fire alarms, security systems, and closed-circuit TV cameras. As a result of marital difficulties, Alexander moved out of the marital residence on March 27, 2020.

¶ 6 In April 2020, Eneya, E.K., and Eneya's parents moved to Naperville, Illinois, without informing Alexander of their whereabouts. Shortly after their move to Naperville, and again without informing Alexander, Enya, E.K., and Eneya's parents moved to Buffalo Grove.

¶ 7 After Eneya and E.K. moved to Naperville, Alexander discovered their location. He obtained an order from a New York court to return E.K. to New York. Eneya was served with that order. Eneya then obtained an order of protection against Alexander in the circuit court of Du Page County. Upon learning of the Illinois action, the New York court relinquished jurisdiction.

¶ 8 B. Pretrial Proceedings

¶ 9 On May 26, 2020, Eneya petitioned in Du Page County for dissolution of marriage. She alleged irreconcilable differences. On May 5, 2021, Alexander filed a counterpetition for dissolution of marriage, which he withdrew prior to trial.

¶ 10 1. *Eneya's Emergency Motion for Substitution of Judge*

¶ 11 On November 16, 2020, Judge Neal W. Cerne began presiding over the matter. Judge Cerne entered temporary orders (1) granting Eneya child support, (2) denying Eneya interim attorney fees, (3) restricting the parties from traveling outside Illinois with E.K.,[1] (4) granting

---

[1]Alexander continued to reside in New York.

Alexander parenting time, and (5) placing E.K. in part-time day care. In addition, Judge Cerne set dates for the close of discovery and trial.

¶ 12    On May 12, 2021, Eneya filed an emergency motion for substitution of judge as of right. On May 14, 2021, Judge Cerne denied the motion for substitution of judge on the grounds that the motion was untimely and that the court had ruled on substantive matters. Subsequently, the court denied Eneya's motion to reconsider and her request to certify the question to this court.

¶ 13                              2. *E.K.'s Day Care*

¶ 14    On April 14, 2021, Alexander filed an emergency motion seeking temporary allocation of decision-making responsibilities for E.K. Alexander alleged the following. Eneya unilaterally enrolled E.K. in day care in Buffalo Grove. After learning this, Alexander expressed his concerns to Eneya about her lack of discussion with him regarding the choice of day care, the facility's COVID-19 precautions, and the duration of E.K.'s enrollment. Alexander researched other day care facilities in Eneya's area and proposed three to Eneya. Eneya rejected all three in favor of Chateau Elite, a Russian-speaking daycare. Alexander was concerned that E.K. would not learn English. Alexander also generally objected to day care, as Eneya was not employed and could care for E.K.

¶ 15    The court held a hearing on April 21, 2021. As of that date, Eneya had already enrolled E.K. full-time at Chateau Elite. The guardian *ad litem*, Kiley Whitty, raised several concerns about the enrollment. She stated that Chateau Elite would not provide Alexander access to information concerning E.K. Whitty stated that Chateau Elite would not furnish any information to her either, nor would Eneya sign authorizations so that Whitty could obtain information from Chateau Elite. Whitty's next concern was that Chateau Elite was not following Illinois Department of Health guidelines regarding wearing face masks due to the pandemic. Whitty's last concern was that E.K.

should not be in day care full-time. Whitty recommended that E.K. attend Kiddie Academy in Arlington Heights part-time.

¶ 16    Eneya's counsel, Shawn Monroe, expressed that E.K. spoke Russian and Hebrew at home and would be more comfortable with Russian at day care. Monroe noted that personnel at Chateau Elite also spoke English. Alexander's counsel noted that Chateau Elite's website advertised that it was monolingual Russian.

¶ 17    The court stated that its main concern was whether E.K. should be in day care full-time. The court determined that it was in E.K.'s best interests to be cared for at home by Eneya and her parents. The court also noted that Eneya would have to find work. The court ruled that part-time day care at Kiddie Academy was more suitable than Chateau Elite.

¶ 18    Monroe stated that Chateau Elite also provided part-time daycare. Then, the following occurred.

> "[MR. MONROE]: Judge, why can't the child stay in Chateau Elite half days since he's already there?
>
> * * *
>
> [THE COURT]: *** I'm not going to be bound by parties taking actions upon themselves, and then saying, Oh, Judge, we've been doing it for this long. And I told you explicitly the fact that the child is there is not going to be a factor, because otherwise I would have pulled the child immediately at that time—
>
> [MR. MONROE]: But Chateau Elite has half days.
>
> [THE COURT]: Counsel, I'm not going to be toyed [*sic*]. Okay? All right. I would have taken the child out immediately if it was going to be used against me. You're not going to play with me like that. Okay?"

¶ 19    On April 21, 2021, the court entered a written order directing that E.K. be "immediately removed" from Chateau Elite and "immediately enrolled" at Kiddie Academy for three half days per week.

¶ 20            3. *Eneya's Motion for Declaratory Judgment—the Ketubah*

¶ 21    On May 25, 2021, Eneya filed a verified "motion for a declaratory judgment," pursuant to section 2-701(a) of the Code of Civil Procedure (Code) (735 ILCS 5/2-701(a) (West 2018)), to enforce an alleged marriage contract. Eneya alleged that, upon the parties' marriage, Alexander signed a document known as a "ketubah." Eneya described a ketubah as a "marital agreement" and an "essential requirement of traditional Orthodox Jewish weddings in Israel." Attached to her motion were (1) Eneya's affidavit attesting that Alexander signed the ketubah and intended to be bound by it, (2) a one-page document written in a foreign script (later identified as either Aramaic or Hebrew), and (3) a purported English translation of the foreign document. In pertinent part, the translation, which is not certified, recites the following. Alexander agreed on behalf of himself and his heirs, in the event of a divorce, to pay Eneya $1 million[2] out of all of the property that he owned or would acquire in the future. Alexander agreed not to persuade Eneya to "waive" any of the terms of the ketubah. Alexander further agreed not to remarry and not to leave Israel until he provided Eneya with child support in an amount to be determined by a rabbinical court.

¶ 22    On June 3, 2021, Alexander filed a motion for judgment on the pleadings. Alexander argued that the ketubah is not enforceable as a prenuptial agreement within the meaning of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/501 *et seq.* (West 2018)) and that it contains terms that are against public policy, such as prohibiting Alexander from remarrying.

---

[2]The translation says "dollars" rather than specifying Israeli currency.

¶ 23    At the hearing on the declaratory judgment motion, Eneya asked the court to declare the ketubah valid and subject to an order of specific performance upon dissolution of the marriage. The court found the ketubah to be unenforceable under Illinois law. Specifically, the court found that the ketubah usurped the court's authority to set child support and to divide marital property. The court also found certain terms to be unconscionable, including restricting Alexander's right to remarry and his right to leave Israel. The court opined that the ketubah was a type of wedding vow and, therefore, presented a "religious issue."

¶ 24                    4. *Eneya's Claims of Dissipation of Marital Assets*

¶ 25    On June 25, 2021, Eneya filed a notice of intent to claim dissipation of marital assets. Specifically, Eneya alleged that Alexander (1) withdrew $8000 from a marital account, (2) devalued Alex Solutions, (3) liquidated the lease on one of the parties' two vehicles, and (4) used marital funds to pay child support to a former wife.

¶ 26                    5. *Alexander's Motion for Permanent Injunction*

¶ 27    On June 3, 2021, Alexander filed a motion to restrain Eneya permanently from using the parties' frozen embryos or, in the alternative, to find that Alexander had no child-support obligation for any child born from the frozen embryos. Alexander alleged that Eneya forged his name to a contract giving her sole custody of the embryos. Alexander also alleged that the purported contract was otherwise invalid. The court ordered the motion to be heard with the trial.

¶ 28                    C. The Trial

¶ 29    The trial occurred over four days, commencing on July 8, 2021.

¶ 30                    1. *Eneya's Case-in-Chief*

¶ 31                    a. Alexander—as an Adverse Witness

¶ 32    Under cross-examination as an adverse witness, Alexander testified as follows. In October 2017, the parties established Alex Solutions as business partners and equal shareholders. Alex Solutions was Eneya's only source of income. From October 2017 to the present, Alex Solutions was Alexander's sole employer, although he did some independent contract work. Beginning in March 2020, with the onset of the COVID-19 pandemic, Alex Solutions' business "dried up." The business's largest customers terminated Alex Solutions' services. Also contributing to the business's demise was the parties' move several hours away from New York City. In mid-March 2020, Alexander began receiving unemployment compensation benefits.

¶ 33    On March 27, 2020, Alexander moved out of the marital home. Alexander took the keys and garage remotes from the home, but the apartment manager had another set of each. That evening, Alexander received an e-mail from Eneya telling him that she would be moving soon. Between March 27 and March 31, 2020, Eneya confirmed in e-mails to Alexander that she would be moving out of state. Eneya "emptied out" both their personal and business bank accounts.

¶ 34    The parties owned a 2015 Toyota Highlander and leased a 2019 Toyota 4-Runner. When Alexander left the marital home on March 27, 2020, he and Eneya agreed to sell the Highlander to cover Alex Solutions' debts. Alexander did not sell the vehicle because Eneya obtained an order of protection covering that vehicle, and later, the parties agreed that Alexander would not sell it. On May 10, 2021, Alexander relinquished the lease on the 4-Runner without informing Eneya.

¶ 35    In April 2020, Alexander, without Eneya's knowledge, opened a corporate checking account to which only he had access. Alexander made business deposits into that account. Alexander also made withdrawals from the account. The checks that were deposited into the account in 2020 were for jobs that were completed in 2019. Alexander did not keep records of the dates that he performed such services. Alex Solutions reported income in 2020 of approximately

$89,000. That income was for jobs that were performed prior to 2020. Alexander's unemployment benefits totaled approximately $31,000 in 2020. In addition, Alexander withdrew $8000 from an IRA account in 2020.

¶ 36    On March 27, 2020, Alexander opened a personal checking account to which Eneya did not have access. Alexander deposited into that account checks he received for his unemployment benefits and for doing independent-contractor work.

¶ 37    In 2021, without Eneya's knowledge, Alexander obtained a $70,500 government small business loan for Alex Solutions. Alexander pledged the business's assets as collateral. Alexander paid himself a salary from Alex Solutions but paid Eneya nothing.

¶ 38    Alexander's parents loaned him $102,000 for surrogacy purposes. He did not have any records to show that the money was a loan. In 2016, Alexander began receiving $600 per month in insurance proceeds from fire damage sustained by a business that he owned while he was in Israel. Those payments would cease in 2023. Alexander signed those payments over to his brother in Israel to pay child support to Alexander's former wife. After Alexander left the marital home in March 2020, some friends loaned him money.

¶ 39    Upon questioning by his own counsel, Alexander testified as follows. He had an interest in an Israeli company known as Kast Systems. That company was formed in 2003 but last made money in 2014. Kast Systems consisted of debt.

¶ 40    Even though Eneya informed Alexander that she would be moving away from New York, he did not believe her because, during the pandemic, "everybody prefer [*sic*] to stay home." Prior to May 2020, Alexander did not know that Eneya was in Illinois. He tried to reach Eneya, but she had removed the SIM card from her phone. After a couple weeks of not being able to contact Eneya, Alexander had her phone disconnected so that he would not have to pay the bill. Upon

learning that Eneya was in Illinois, Alexander obtained a court order giving him sole custody of E.K. and for E.K.'s return to New York. Alexander and a friend drove to Illinois, where his friend served the order on Eneya. Two days later, Eneya obtained from an Illinois court an order of protection against Alexander.

¶ 41    Alexander was making the lease payments on the Toyota 4-Runner. He told Eneya that she could take over those payments, but she declined to do so, so he returned the vehicle. Alexander opened a new business account because Eneya withdrew $5000 from their old business account. He opened a personal checking account because Eneya withdrew all of the funds from their joint account. Alex Solutions did not enter into any new contracts in 2020. All of the money that came into Alex Solutions after 2020 was used to pay business expenses. Eneya took the company computer that contained all of Alex Solutions' business records.

¶ 42    Alexander's parents continued to loan him money after E.K. was born, because Alexander and Eneya were planning to have a second child by surrogacy.

¶ 43                          b. Svetlana Shoykhet

¶ 44    Svetlana Shoykhet is Eneya's mother. She testified through a Russian interpreter, as follows. Svetlana and Boris Shoykhet, her husband and Eneya's father, sold their apartment in Israel and liquidated Boris's pension to fund Eneya's plan to have a baby through surrogacy. Eneya's parents gave her approximately $150,000 in cash so that Eneya could have a child.

¶ 45    The Shoykhets, Eneya, and E.K. left New York to escape Alexander. Svetlana never saw Alexander interact with E.K. The Shoykhet family was currently living in Buffalo Grove, and the Shoykhets were supporting Eneya.

¶ 46                          c. Kiley Whitty—the Court's Witness

¶ 47    Whitty summarized her written report, as follows. Whitty began her investigation on July 6, 2020. She met and corresponded with both parents. Whitty also reviewed the court file, various documents submitted by the parties, and E.K.'s medical records.

¶ 48    In September 2020, Whitty observed Alexander's 45-minute visitation with E.K. E.K. was comfortable with Alexander. E.K. seemed comfortable with Eneya also, although Eneya would not permit Whitty to visit E.K. at her home or a playground. Whitty testified that Eneya did not allow Whitty follow-up visits after August 2020.

¶ 49    In January 2021, Whitty observed Alexander's visitation with E.K. in Alexander's hotel room.[3] The room was "safe and appropriate" for the child, and Alexander had a high chair, food, cups, diapers, toys, and sleeping paraphernalia for E.K. Whitty had no concerns for E.K.'s safety or well-being during Alexander's visits. Eneya would not permit Whitty to visit with E.K. immediately after Alexander's visits to determine whether E.K. displayed issues after his father's visits.

¶ 50    Whitty testified that E.K. was healthy. According to Whitty, Eneya noted on Chateau Elite's enrollment form that E.K. was a "picky eater" but was otherwise healthy. This was different from August 2020, when Eneya was reporting that E.K. was banging his head and having night terrors, which Eneya attributed to E.K.'s visits with Alexander. E.K.'s physician believed that E.K.'s behavior could have been caused by other things, such as stress from multiple moves or not having consistent parenting time. Whitty believed that, given Alexander's limited travel budget, maintaining once-monthly visits was appropriate.

---

[3]Alexander traveled from New York to visit E.K.

¶ 51    Whitty testified that Eneya consistently refused to give her or Alexander "substantial amounts" of information about E.K. Eneya had informed care providers that she had sole custody of E.K. and that Alexander had sexually abused him, thus, blocking Alexander from communicating with providers. Whitty noted that Eneya also exaggerated E.K.'s medical conditions, such as a hernia and reflux. Although the doctor recommended that E.K. be allowed to cry in his crib, Eneya insisted that crying aggravated E.K.'s stomach hernia. Instead of accepting the doctor's recommendation for a routine medication to help the reflux, Eneya wanted E.K. to see specialists.

¶ 52    The court then examined Whitty. Specifically, the court asked why Eneya came to live in Illinois. According to Whitty, Eneya searched the Internet to find the best and safest places to live and found Naperville. Also, Eneya had heard about Naperville from a family friend. As to Eneya's impetus to leave New York, Whitty testified that Eneya had accused Alexander of physically abusing her and E.K. According to Eneya, when E.K. was approximately four months old, Alexander stuffed an orange peel in E.K.'s mouth and tried to force E.K. to do sit-ups. Eneya also alleged that Alexander sexually abused E.K.

¶ 53    Whitty had "serious reservations" about Eneya's ability to foster a relationship between Alexander and E.K. Eneya told Whitty that Eneya wanted Alexander to "just go away and never speak to her or see the child ever again." According to Whitty, Eneya was not "willing to communicate with [Alexander] with regard to decisions for the child." Rather, Eneya's court-ordered communications with Alexander were perfunctory, on the order of "Your son is well, safe and happy with our family." Eneya refused to allow Whitty or Alexander access to E.K.'s medical information. Whitty did not consider making Alexander the primary parent, because Alexander never made such a request.

¶ 54  Under cross-examination by Eneya's attorney, Whitty testified to the following. Eneya was granted an order of protection against Alexander after a hearing in which Alexander was present and represented by counsel. That order of protection was later extended. Whitty was also aware of an agreed no-contact order between the parties.

¶ 55  Whitty opposed enrolling E.K. in day care at Chateau Elite, because Chateau Elite did not provide parents with written reports or updates and Whitty was concerned that Eneya would not pass on information to Alexander. In addition, the director at Chateau Elite had been "curt and short" with both Whitty and Alexander, Eneya did not provide Alexander's contact information to Chateau Elite, and Whitty believed that the day care would not "facilitate [Alexander's] involvement."

¶ 56  Whitty knew that Eneya had made allegations that Alexander sexually abused E.K. Whitty testified: "I did not find [Eneya's] explanations *** to be particularly credible." Whitty found Alexander to be more credible than Eneya.

¶ 57  Under cross-examination by Alexander's attorney, Whitty testified that she reviewed reports of four supervised visits that Alexander had with E.K. The reports indicated that those visits were "without incident" and that Alexander presented no danger to E.K. Whitty was also aware that the order of protection had been vacated and that Alexander's parenting time had been extended. On January 29, 2021, Whitty observed Alexander's visitation with E.K. During that visit, E.K. was "content, he was happy, he was playful, he was energetic."

¶ 58  Eneya did not respond to Whitty's requests for home visits or provide Whitty with releases to obtain E.K.'s medical information. Whitty did not believe that Eneya was complying with her obligation to provide Alexander detailed information concerning E.K. Whitty recommended day

care for E.K. at Kiddie Academy because that facility would provide Alexander with a portal where he could stay informed as to E.K.'s daily activities.

¶ 59                                    d. Boris Shoykhet

¶ 60    Boris Shoykhet testified through a Russian interpreter, as follows. He is Eneya's father. Boris gave Eneya $150,000 in cash for the surrogacy process. This payment was a loan, which Eneya promised to repay. After E.K. was conceived, Boris gave Eneya another $80,000 for a second surrogacy. "Something went wrong" with the second surrogacy, and Eneya refunded $51,000 to Boris after the surrogacy agency kept the balance.

¶ 61                                    e. Eneya

¶ 62    Eneya was the "administrator manager" for Alex Solutions. She handled all of the office work, including accounting and drafting customer contracts. Currently, she was working for a temporary agency, earning $600 per week net.

¶ 63    In 2013, while the parties were living in Israel, they created embryos. They brought the embryos to the United States when they moved here. The embryos were stored at the New England Fertility Institute in Connecticut. Eneya and Alexander signed a contract on July 8, 2015, giving the embryos to Eneya if the parties divorced. The original document was identified and entered into evidence as petitioner's exhibit No. 45.

¶ 64    Eneya's parents gave her $150,000 for the first surrogacy. Neither Alexander nor his parents contributed to this surrogacy fund. Alexander's parents did not know about the surrogacy. Eneya intends to repay the sum to her parents. Eneya planned the second surrogacy even before E.K was born. Alexander was against a second surrogacy. Eneya's parents gave her $80,000 toward the second surrogacy. The second surrogacy was canceled due to the parties' separation.

$30,000 that Eneya had paid toward it was nonrefundable. Eneya remitted the balance of $51,000 to her father.

¶ 65    E.K. was born prematurely. He was underweight and had "severe" acid reflux and a hernia. Svetlana helped care for E.K., as Alexander always made excuses to "rest" or "sleep" instead of help with the baby. When Alexander tended the baby, "horrible" things happened. Alexander stuffed an orange peel into E.K.'s mouth. Another time, Alexander almost dropped the baby. On July 30, 2019, Eneya called a domestic violence social worker because Alexander grabbed her neck.

¶ 66    When Alexander moved out of the marital home in March 2020, he took everything that belonged to him. Alexander also took both vehicles. Eneya had always driven the Highlander, which Alexander had purchased for her. She did not agree to sell that vehicle after the parties separated. Eneya took money from the parties' bank accounts because Alexander "didn't leave me anything" except $12,000 in business debts. Alexander even took all of the appliances, including the washer and dryer. Under questioning by the court, Eneya clarified that Alexander left items inside the garage but took the remote so that she could not access the garage. On April 3, 2020, Alexander tried to break into the former marital apartment.

¶ 67    Eneya, E.K., and her parents moved to Naperville because Eneya feared for her and E.K.'s safety. Eneya feared that Alexander would come after her with an axe because he had threatened her in an e-mail. They moved to Buffalo Grove because there is a large Russian-speaking community there.

¶ 68    In November 2020, pursuant to a court order, Alexander began paying Eneya $100 per month in child support. Eneya was still part owner of Alex Solutions, although Alexander was now "in control" of the business. She received nothing from the business except the $5000 she took

from the corporate bank account before she moved to Illinois. Alex Solutions owned approximately $80,000 worth of equipment. Alex Solutions' business stayed "stable" during the pandemic. Eneya believed that Alexander was also working for another company owned by his friend Vadim Belyaev.

¶ 69   Eneya first enrolled E.K. in a Jewish day care in Buffalo Grove, but she did not send E.K. there when Alexander refused to help pay the expense.[4] Then, Eneya placed E.K. at Chateau Elite. She chose Chateau Elite because it is Russian-speaking, and she approved of the food and culture. E.K. still has health issues, including an allergy to hazelnuts. Eneya keeps Alexander informed of all of E.K.'s medical conditions.

¶ 70   Alexander received an insurance award of 160,000 Israeli shekels, or approximately $60,000. Eneya was not aware that Alexander had assigned this award to his brother to pay child support to Alexander's former wife.

¶ 71                                       f. Shanna Hoekstra

¶ 72   Shanna Hoekstra is a clinical therapist. Beginning on July 27, 2020, she met five times with Eneya. Eneya believed that E.K. was having behavioral problems related to the parties' separation and divorce. Hoekstra recommended that E.K. have Facetime visits with Alexander rather than in-person visitation. Hoekstra did not speak with E.K. or his doctors. All of Hoekstra's information came from Eneya.

---

[4]On cross-examination, Eneya testified that Alexander did not refuse to pay for day care and that he proposed four alternatives. Eneya testified that she rejected all of Alexander's suggestions because the day care facilities that he recommended were English-speaking only and offered American food.

¶ 73    Following Hoekstra's testimony, Eneya rested.

¶ 74                    2. *Alexander's Case-in-Chief*

¶ 75                        a. Alexander

¶ 76    Alexander commenced his case-in-chief by testifying as his first witness. Because of COVID-19, Alex Solutions "shut down" in 2020. People started working from home, which changed the entire market. Most of Alex Solutions' customers were commercial entities that no longer needed new security systems. Currently, Alex Solutions was doing "troubleshooting," servicing existing systems. Alex Solutions owned no real estate or inventory. Alexander had one bag of tools worth about $500. Other than goodwill, Alex Solutions had zero value.

¶ 77    In January 2021, Alexander obtained a small business loan of $70,500 to keep Alex Solutions operating. From those loan proceeds, Alexander paid himself a salary of $4800 per month plus other business expenses. The loan would come due in January 2022 and was not subject to forgiveness. Alex Solutions' credit card carried a balance of $9094.50. Alex Solutions' checking account had a balance of $5783.94. Alex Solutions' savings account had a balance of $55,002.37, which was what was left of the loan proceeds. Business picked up after June 2021, but Alex Solutions was still not making a profit. Alex Solutions could not be sold to a third party for any money. In addition to paying himself $4800 per month, Alexander earned $295 per month working as an independent contractor for a company called One Path.

¶ 78    Alexander owed his ex-wife in Israel $900 per month in child support. Alexander collected $600 per month from an insurance claim in Israel, which he gave to his brother to pay toward the child support. Alexander's brother paid the additional $300 per month, which Alexander agreed to repay to his brother. To date, Alexander owed his brother approximately $22,000.

¶ 79    Prior to his marriage to Eneya, Alexander owned a business in Israel. That business was no longer operating and consisted only of debt. Alexander maintained three personal credit cards with a total balance of approximately $10,000. Alexander owed his parents $102,000. Alexander owed Amichai Levy $6500. He owed Belyaev $41,000. Alexander owed $3800 for the apartment where he and Eneya lived before their separation.

¶ 80    When Eneya left New York, she took all of the household items and appliances, including Alexander's jewelry. The items that Eneya removed from the marital residence were worth between $15,000 and $20,000. Alexander's monthly trips to Illinois to visit E.K. cost approximately $1200.

¶ 81    Alexander and Eneya shared parental responsibilities for E.K. while they lived together. As E.K. got older, Alexander played with him. Alexander never physically abused either Eneya or E.K. After Alexander moved out, he returned to the apartment to try to speak with Eneya. Boris told Alexander that he was not welcome, and he left. The next time Alexander came to the apartment, it was empty.

¶ 82    Eneya does not give Alexander information concerning E.K. During one of Alexander's visits with E.K., Alexander found Eneya, wearing a blonde wig, stationed outside his hotel room door. She fled when Alexander tried to photograph her. Since E.K. has been attending day care at Kiddie Academy, Alexander has received daily reports from that facility regarding E.K.

¶ 83    Alexander denied that he entered into a contract with Eneya concerning the disposition of their embryos. He did not sign petitioner's exhibit No. 45, and he identified all of the handwriting on that exhibit as Eneya's. Alexander's intention when they created the embryos was to donate them if the parties ever separated or divorced. He affirmed that he currently wanted to donate the

embryos. On cross-examination, however, he clarified that he did not want the embryos donated to Eneya.

¶ 84                                    b. Eneya—as an Adverse Witness

¶ 85    Under cross-examination as an adverse witness, Eneya said that she took accounting courses in Israel but never was licensed as an accountant. Eneya also had experience in medical billing, human resources, and marketing. Eneya paid her attorneys from various bank accounts and a credit card. Eneya took some furniture from the marital apartment when she moved to Illinois, but Alexander took the washer and dryer.

¶ 86    Alexander rested. Eneya testified in rebuttal that she and Alexander agreed that Eneya would receive the embryos if the parties separated or divorced and that, if Eneya died, her parents would receive the embryos.

¶ 87                                    D. The JDOM

¶ 88    On November 23, 2021, the court entered its written JDOM. The court found that Eneya "has shown little or no regard" for "speaking truthfully." The court also found that Eneya showed "little or no regard" for the importance of a father-son relationship. Specifically, the court found that Eneya left New York with E.K. "under cover of darkness," meaning that she did not inform Alexander of their whereabouts and then, shortly after, moved to Buffalo Grove, also without informing Alexander. The court found that Eneya made these moves in secrecy to prevent Alexander from having a relationship with E.K. Because Eneya was, in the court's opinion, a "flight risk" and inclined to "abscond" with E.K., the court permanently restrained Eneya from moving from her home in Buffalo Grove, possessing E.K.'s passport without leave of court, and contacting the New England Fertility Institute. The court also specifically found that Alexander did not physically abuse either E.K. or Eneya.

¶ 89 The court found that Alexander did not dissipate the value of Alex Solutions but that Alex Solutions lost its customers due to COVID-19.

¶ 90 The court granted Alexander exclusive possession and control of the embryos. It found that petitioner's exhibit No. 45, the purported contract giving the embryos to Eneya, was not "authentic." The court ordered Alexander to direct the clinic to donate the embryos or destroy them. It also awarded Alexander the escrow for maintaining the embryos.

¶ 91 The trial court awarded Eneya the majority of parenting time, as Alexander resides in New York. The court also ordered that E.K. remain in day care at Kiddie Academy.

¶ 92 The court ordered Alexander's child-support obligation to "deviate down" from the statutory amount of $636 to $100 per month "because of the expense to visit his child."

¶ 93 The court found that the value of the marital estate was "negligible." It awarded each party the furniture and "furnishings" in their possession, their respective financial accounts and IRAs, and the debts in their separate names. The court awarded Alex Solutions to Alexander and directed Eneya to transfer her interest to Alexander. It found that Alexander had been operating Alex Solutions as if it were a sole proprietorship and that its only value was Alexander's personal goodwill. The court awarded Alexander the Toyota Highlander, worth $11,000, and $8163 in cash. That amount included $6478 held in the embryo escrow. The court found that both parties dissipated assets by paying attorney fees from marital accounts. The court equalized fees, finding that Eneya owed Alexander $35,459. However, the court ordered Eneya to pay Alexander $30,000 to equalize attorney fees. Eneya appeals.

¶ 94                                    II. ANALYSIS

¶ 95 Preliminarily, we address the timeliness of our decision. This case is "accelerated" pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018) because it involves, *inter alia*, allocation

of parental responsibilities. Regarding such cases, Rule 311(a) provides, in pertinent part, that, except for "good cause shown," the appellate court shall issue its decision within 150 days following the filing of the notice of appeal. *Id*. Here, the 150-day period to issue our decision expired on April 29, 2022. However, on March 15, 2022, on the court's own motion, we struck Eneya's appendix because it failed to comply in numerous respects with Illinois Supreme Court Rule 342 (eff. Oct. 1, 2019). Pursuant to our order, Eneya filed an amended appendix on March 22, 2022. Most importantly, the original appendix failed to include the names of all witnesses and the pages on which their direct, cross, and redirect examinations began. This matter was tried for four days, and six witnesses testified. Without an appendix, our ability to wade through the reports of proceedings was impeded. Furthermore, Eneya requested oral argument, which was conducted on May 23, 2022. Finally, in light of a judicial reassignment prompted by the redistricting of the Illinois Courts, authorship of this case was changed. Given the foregoing and the complexity of the embryo issue, we find good cause for issuing our decision after the 150-day deadline.

¶ 96    Eneya raises numerous issues. However, before we address the merits of her appeal, we must address her noncompliance with Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020), which requires the statement of facts in the appellant's brief to contain the facts "necessary to an understanding of the case." (Internal quotation marks omitted.) *Hall v. Naper Gold Hospitality, LLC*, 2012 IL App (2d) 111151, ¶ 9. Here, as noted, the trial consumed four days of testimony from six witnesses, and Eneya raises issues related to the evidence adduced at trial. Yet, Eneya's statement of facts devotes to the trial *one-half sentence* in a 5-page statement of facts: "The final trial on the merits was broken up over four (4) days and on November 23, 2021, the trial Court entered a Judgment for Dissolution of Marriage." Otherwise, the statement of facts consists of summaries of the pleadings and the JDOM.

¶ 97 We have discretion to strike an appellant's brief and dismiss an appeal for the appellant's failure to furnish a complete statement of facts. *Alderson v. Southern Co.*, 321 Ill. App. 3d 832, 845 (2001). The rules concerning appellate briefs are not mere suggestions. *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999). Here, the violation is serious, as Eneya's statement of facts omits all of the trial testimony. The incomplete statement of facts and the noncompliant appendix delayed our review. Nevertheless, we decline to impose the harsh sanction of striking Eneya's brief and dismissing this appeal. Eneya includes some trial testimony with record citations in the argument sections of both her opening and reply briefs, and the record is not so voluminous that the omission from the statement of facts completely hindered our review. Accordingly, we turn to the merits.

¶ 98                                    A. Substitution of Judge

¶ 99 After Judge Cerne presided over the matter for six months, made rulings concerning, *inter alia*, temporary child support, day care, and interim attorney fees, and set the matter for close of discovery and trial, Eneya moved on an emergency basis for substitution of judge as a matter of right. Judge Cerne denied that motion on the grounds that it was untimely and that he had made substantial rulings. Section 2-1001(a)(2)(i) of the Code (735 ILCS 5/2-1001(a)(2)(i) (West 2018)) provides that, in any civil action, each party is entitled to one substitution of judge without cause as a matter of right. If such a motion is made before the presiding judge has made a substantial ruling, the right to substitution is absolute, and any order entered after such a motion is erroneously denied is void. *Aussieker v. City of Bloomington*, 355 Ill. App. 3d 498, 500 (2005). The statute is liberally construed, and where its conditions are met, the trial court has no discretion to deny the motion unless the motion was made simply to delay or avoid trial. *Id.* The party seeking a substitution of judge as of right must (1) timely exercise the right, (2) file the motion before trial or hearing begins, and (3) file the motion before the trial judge has ruled on any substantial issue

in the case. *Williams v. Leonard*, 2017 IL App (1st) 172045, ¶ 11. " 'A ruling is substantial if it relates to the merits of a case.' " *Id.* (quoting *Petalino v. Williams*, 2016 IL App (1st) 151861, ¶ 18). We review *de novo* the denial of a motion for substitution of judge as of right. *Williams*, 2017 IL App (1st) 172045, ¶ 9.

¶ 100   Eneya argues that her motion was timely filed, as the discovery cut-off was one month away, and trial was two months away. She also argues that the court's temporary orders did not constitute substantial rulings, because they temporarily "situated" the parties, pending a trial on the merits. She likens the court's temporary orders on child support, attorney fees, and day care to scheduling and discovery orders or pretrial conferences. Eneya, in part, relies on *Palos Community Hospital v. Humana Insurance Co.*, 2021 IL 126008. That case is inapposite, as it involved the "test-the-waters" doctrine, which permitted the denial of a motion for substitution of judge before substantial rulings were made if the party presenting the motion were able to form an opinion as to the court's disposition of the case. *Id.* Here, the court did not base its denial of substitution on the test-the-waters doctrine.[5]

¶ 101   Alexander argues that Eneya's emergency motion for substitution of judge violated a local rule's requirement of an affidavit attesting to the nature of the emergency. However, at the hearing on the motion, Alexander's attorney waived any such objection when she agreed that the matter should proceed as an emergency. Alexander also contends that Eneya's petition for dissolution of marriage placed in issue the matters upon which the court ruled. In her petition for dissolution of marriage, Eneya asked the court to grant her the majority of parenting time and no parenting time

---

[5]In her reply brief, Eneya states that she cited *Palos* to refute an argument raised by Alexander before the trial court.

for Alexander. Eneya also asked the court for equitable division of the marital property, equitable apportionment of marital debts, temporary and permanent maintenance, and temporary and permanent child support.

¶ 102   Eneya does not dispute that Judge Cerne made rulings on matters such as child support, parenting time, and allocation of parental responsibilities (day care) before she filed the motion for substitution of judge. She contends that those rulings, being temporary, were not substantial. Eneya also contends that the motion for substitution of judge was timely, as it was brought two months before trial was set to begin and there is no evidence that a substitution of judge would have delayed the trial. However, Judge Cerne found that a substitution of judge would have required a delay of trial.

¶ 103   Even if Eneya's motion for substitution of judge were timely, we agree with Alexander that the judge made substantial rulings. Alexander asserts that temporary orders can be substantial rulings. Alexander relies on *In re J.S.*, 2020 IL App (1st) 191119, and *In re D.M.*, 395 Ill. App. 3d 972 (2009). In *J.S.*, the appellate court held that the respondent-mother was not entitled to a substitution of judge as of right where the trial court had issued a child protection warrant and a temporary custody order. *J.S.*, 2020 IL App (1st) 191119, ¶ 57. The appellate court reasoned that the trial court, in issuing those orders, had considered whether the minor was at risk of harm, which question was "directly related" to the merits of the neglect case. *Id.* The appellate court also noted that the trial court's orders were not merely "procedural" regarding the "mechanics of the case." *Id.* In *D.M.*, a neglect case, the court held that the trial court's pretrial rulings on tasks that the parents must complete and the foster placement of the children were substantial rulings even though the parents had agreed to the entry of those orders. *D.M.*, 395 Ill. App. 3d at 977.

¶ 104    Here, Eneya is mistaken in her argument that temporary orders dealing with child support, property division, and allocation of parental responsibilities are not directly related to the merits of the case. In a dissolution case, those issues are related parts of the dissolution claim. *In re Marriage of Meyer*, 197 Ill. App. 3d 975, 978 (1990).

¶ 105    We note that Eneya filed the motion for substitution of judge only after Judge Cerne ruled that E.K. would attend day care at Kiddie Academy rather than Chateau Elite. Eneya argues that this order was not substantial because the court "simply exercised its own selection of daycare providers from those listed in the parties' memoranda." Yet, the record belies this assertion. The court heard testimony from Whitty, who recommended Kiddie Academy because it would provide Alexander with daily updates regarding E.K.'s activities, something Eneya had sought to avoid. The court also made a finding that attending day care part-time rather than full-time was in E.K.'s best interests. We also reject Eneya's contention that orders respecting financial matters and temporary child support were procedural, intended only to "hit the pause button." These were not mere procedural rulings dealing with the mechanics of the case; they touched on issues directly related to the merits. Accordingly, we hold that the court properly denied the motion for substitution of judge.

¶ 106                    B. Award of the Embryos to Alexander

¶ 107    Next, Eneya challenges the trial court's determination concerning the frozen embryos that Alexander and Eneya had stored with the New England Fertility Institute. The trial court granted Alexander exclusive control of the embryos. It also ordered that Alexander "shall direct the Institute to donate the embryos or have them destroyed."

¶ 108    In support, the court found:

"As there is no written agreement the Court must look to the oral agreement. The parties undoubtedly agreed to the creation of the embryos for the creation of 'their' child and actually used them to create a child that was born during the marriage. They were married at the time and anticipated to remain married. Both pairs of grandparents contributed large sums of money to support the birth of a child of the marriage. It was not even contemplated that they would ever divorce and this could explain why there was no written agreement providing for the possibility of divorce. Unlike in *Szafranski*[ *v. Duston*, 2015 IL App (1st) 122975-B], this process of creating embryos was not done solely for Eneya's benefit, it was done for the benefit of the marriage, both parties wanted a child in their marriage.

\*\*\* With no agreement, written or oral, on the treatment of the embryos following a divorce, the Court must weigh the interests of the parties. *Infra*. Eneya wants to have a child out of wedlock and Alex wants [the embryos] donated to another married couple so the child could be born in a marriage. While both desire that a child be born, Alex appears to be more true to the original intention of having a child being born with both a mother and father that [*sic*] are married."

¶ 109 Eneya argues that there is no evidence to support the court's finding that she intends to use the embryos to have a child out of wedlock. She also asserts that Alexander's testimony that he wanted the embryos donated was self-serving, as his true intention (reflected in his testimony that he did not want Eneya to have another child "after what she did with our son") was to deprive Eneya—who could not carry a child to term—of having another child by using those embryos through surrogacy. From this, Eneya concludes that the court's finding that Alexander has a superior interest in the embryos was against the manifest weight of the evidence and contrary to

the holdings in *Szafranski v. Dunston*, 2013 IL App (1st) 122975 (*Szafranski I*), and *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B (*Szafranski II*).

¶ 110 Alexander responds that awarding the embryos to Eneya would expose him to having additional children with her against his will, as well as expose him to the financial burdens of supporting those children. Therefore, he concludes, the court's balancing of the parties' respective interests was not against the manifest weight of the evidence.

¶ 111 Courts have taken three different common-law approaches in resolving disputes over frozen embryos: (1) a contractual approach, in which courts enforce the parties' unambiguous agreement that has contemplated or encompassed the contingency of divorce (see, *e.g.*, *Kass v. Kass*, 663 N.Y.S.2d 581 (App. Div. 1997)); (2) the contemporaneous-mutual-consent approach, in which courts do not enforce earlier agreements between the parties when one or both of them have changed their minds, and with the *status quo* prevailing unless and until the parties mutually consent (see, *e.g.*, *In re Marriage of Witten*, 672 N.W.2d 768 (Iowa 2003); *A.Z. v. B.Z.*, 725 N.E.2d 1051 (Mass. 2000)); and (3) the balancing approach, where, in the absence of an enforceable agreement, courts balance the parties' interests in seeking or avoiding procreation (see, *e.g.*, *Jocelyn P. v. Joshua P.*, 250 A.3d 373 (Md. Ct. Spec. App. 2021); *In re Marriage of Rooks*, 2018 CO 85; *J.B. v. M.B.*, 783 A.2d 707 (N.J. 2001); *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992); *Reber v. Reiss*, 42 A. 3d 1131 (Pa. Super. Ct. 2012); see also Michael T. Flannery, *"Rethinking" Embryo Disposition Upon Divorce*, 29 J. Contemp. Health L. & Pol'y 233 (Spring 2013).

¶ 112 Each of the approaches has its strengths and weaknesses. Flannery, *supra*, at 275. The contractual approach offers predictability and autonomous decision-making but no ability to address contingencies that were not contemplated in the earlier agreement. *Id.* The contemporaneous-mutual-consent approach allows for parties to change their minds but lacks

predictability and invites the very real possibility that the parties may never come to a mutual decision. *Id.* at 275-76; see also Sarah B. Kirschbaum, *Who Gets the Frozen Embryos During a Divorce? A Case for the Contemporaneous Consent Approach*, 21 N.C. J.L. & Tech. 113, 140 (Dec. 2019). The balancing approach allows courts to consider the individual interests of the parties while safeguarding each party's decision-making authority but can involve burdensome litigation and is susceptible to inconsistency and unpredictability because it is fact dependent. Flannery, *supra*, at 265-66, 276.

¶ 113    Most courts agree that the ideal scenario is where the parties reach their own decision about frozen embryo disposition; however, an agreement often does not exist. See Mary Ziegler, *Beyond Balancing: Rethinking the Law of Embryo Disposition*, 68 Am. U.L. Rev. 515, 556 (Dec. 2018); Flannery, *supra*, at 238. We note that, here, Eneya testified at trial that she and Alexander signed a written agreement giving the embryos to Eneya or her parents in the event of the parties' separation or divorce or Eneya's death. Alexander denied that he had ever seen that document or signed it. He testified that he was familiar with Eneya's handwriting and that she forged his signature on the document. The exhibit was entered into evidence as petitioner's exhibit No. 45, but it was not made part of the appellate record. At oral argument, Eneya conceded that there was no written or oral agreement between the parties. Consequently, the contract approach does not apply and we do not consider it.

¶ 114    Rather, we conclude that where, as here, there is no oral or written agreement, the embryo custody issue is properly assessed using the balancing approach. In doing so, we reject *Witten*'s contemporaneous-mutual-consent approach, which has been adopted by only a minority of courts. *Jocelyn P.*, 250 A.3d at 405. Simply put, maintaining what courts call the *status quo* unless and until the parties come to an agreement is unrealistic in that, by removing the courts from the

decision-making process, it effectively gives one party veto power over the frozen embryos without *any* consideration of the parties' interests. See *Rooks*, 2018 CO 85, ¶ 60. Notwithstanding other courts' approaches, we conclude that it is our duty to decide such questions where the parties so request. See *Rooks*, 2018 CO 85, ¶ 72 (adopting balancing approach, which it noted was consistent with Colorado law that directed courts to divide marital property based on consideration of relevant factors and while taking into account that frozen embryos "are marital property of a special character"). Indeed, the problem inherent in the mutual-consent approach would be highlighted by its application to the instant facts. Eneya asks that she be awarded the embryos, and Alexander asks that they be donated, but not to Eneya. Thus, they both desire to have someone use their embryos to procreate, but they disagree over who that/those person(s) should be. Maintenance of the *status quo* would result in neither party achieving what they desire.

¶ 115    Turning then to the balancing approach, the question becomes what interests should be balanced. Though no list of factors to consider is exhaustive, we observe that the earliest line of cases started with the premise that the party wishing to avoid procreation generally should prevail if

> "the other party has a reasonable possibility of achieving [genetic] parenthood by means other than use of the preembryos in question. If no other reasonable alternatives exist, then the argument in favor of using the preembryos to achieve pregnancy should be considered. However, if the party seeking control of the preembryos intends merely to donate them to another couple, the objecting party obviously has the greater interest and should prevail." *Davis*, 842 S.W.2d at 604.

See, *e.g.*, *J.B.*, 783 A.2d at 716-17, 719-20 (couple, who had one daughter, had seven pre-embryos preserved because ex-wife had condition that prevented her from becoming pregnant; no

agreement concerning disposition of pre-embryos; upon divorce, ex-wife sought destruction of pre-embryos and ex-husband disagreed; held that, because the ex-husband was a father and was capable of fathering additional children, the ex-wife's right to prevent implantation of the pre-embryos prevailed; court declined to "force [her] to become a biological parent against her will"); *Davis*, 842 S.W.2d at 603-04 (no agreement where ex-wife wanted to donate frozen embryos to another couple and husband wanted them destroyed; applying balancing test and holding that ex-husband's interest in not procreating outweighed ex-wife's interests; ex-husband had grown up in a home for abandoned children and strongly opposed raising a child in a home with only one parent).

¶ 116   In *Szafranski I*, 2013 IL App (1st) 122975, ¶ 42, the only Illinois case addressing the issue of the proper approach, the First District held that the parties' agreement should be honored but that, where there is no advance agreement, courts must balance the parties' interests. It remanded for application of the contractual approach (or balancing test, if necessary) and to allow the parties to conduct additional discovery. *Id.* ¶¶ 40, 50. In *Szafranski II*, 2015 IL App (1st) 122975-B, ¶¶ 4-5, the First District affirmed the trial court's finding that the parties had entered into an oral agreement allowing the ex-girlfriend to use three pre-embryos without the ex-boyfriend's consent and its ruling in the alternative in the ex-girlfriend's favor under the balancing test. The court considered the ex-boyfriend's argument that he should not be forced to procreate with a woman he did not love; the fact that the ex-girlfriend, who had undergone in vitro fertilization (IVF) because she expected to suffer ovarian failure and infertility as a result of chemotherapy treatment for lymphoma, could not have a biological child without using the pre-embryos; and her testimony that she had lost her father when she was five years old and that she did not expect the ex-boyfriend to support any child born from the pre-embryos. *Id.* ¶¶ 126-27. The First District upheld the trial

court's finding that the ex-girlfriend's interest in using the pre-embryos outweighed any interest the ex-boyfriend had in preventing their use. *Id.* ¶¶ 128-29. It noted that the sole purpose for using the ex-boyfriend's sperm to fertilize the ex-girlfriend's last viable eggs was to preserve her ability to have a biological child in the future and that both parties understood this when they agreed to create the pre-embryos together. *Id.* ¶ 128. It acknowledged that the ex-girlfriend had other options for becoming a parent but that there was no evidence that she could have a biological child other than by using the pre-embryos. *Id.* ¶ 129; see also *Reber*, 42 A.3d at 1138-42 (no agreement; applying balancing approach and upholding award of pre-embryos to the ex-wife, where pre-embryos were her only opportunity to achieve genetic parenthood, as it was highly unlikely or impossible for her to become pregnant after undergoing chemotherapy treatments; adoption is a distinct experience from the ability to procreate biologically, it is a complicated process, and it might not be a practical option for everyone, especially single women).

¶ 117 Recently, in an approach we agree with, the Colorado Supreme Court enunciated a more expansive and nonexhaustive list of factors that courts should and should not consider in balancing the parties' interests. See *Rooks*, 2018 CO 85, ¶¶ 65-70. Under this broader analysis, factors courts should consider (the *Rooks* factors) include, but are not limited to (1) the intended use of the party seeking to preserve the frozen embryos, with greater weight being placed on the interest of the party seeking to become a genetic parent through implantation of the embryos than that of one who desires to donate the embryos to another couple; (2) the demonstrated physical ability or inability of the party seeking to implant the embryos to have biological children through other means; (3) the parties' original reasons for pursuing IVF, such as to preserve a spouse's future ability to have biological children in the face of fertility-impacting medical treatment, such as chemotherapy; (4) the hardship for the person seeking to avoid becoming a genetic parent,

including emotional, financial, or logistical considerations; and (5) either spouse's demonstrated bad faith or attempt to use the embryos as unfair leverage in the divorce proceedings. *Id.* Factors that courts should *not* consider include (1) limiting family size based on financial and economic distinctions, (2) the number of a party's existing children, and (3) whether a party seeking to use the embryos could instead adopt a child or otherwise parent nonbiological children. *Id.* ¶ 71.

¶ 118   Here, the trial court awarded Alexander exclusive possession and control of the embryos (to be donated or destroyed), finding that there was no agreement and that the process of creating the embryos was done for the benefit of the parties' marriage. Weighing the parties' interests, the trial court determined that Eneya wanted to have a child out of wedlock and that Alexander wanted the embryos donated to another married couple so that a child could be born in a marriage. It determined that Alexander's desire was closer to the parties' original intent—*i.e.*, a child being born to married parents.

¶ 119   Initially, before applying the *Rooks* balancing factors, we note that two of the trial court's factual findings were against the manifest weight of the evidence. (*Szafranski II*, 2015 IL App (1st) 122975-B, ¶ 125 (manifest-weight standard applies to court's factual findings)). The first is the court's finding that the parties necessarily wanted a child to be born only to married parents; in reaching this conclusion, the court conflated the parties' intent at the time the embryos were created (*i.e.*, a child born to *their* marriage) with their entirely unexpressed intent as to what would happen to the embryos in the event the marriage ended. Without more, the understanding of the former in no way informs the latter. Second, the court's conclusion that Eneya wanted to have a child out of wedlock is without record support.

¶ 120   Equally problematic to the trial court's application of the balancing factors was its erroneous legal conclusion that, "[s]hould a child be born by surrogacy both Alex and Eneya would

be the presumed parents, 750 ILCS 47/1 *et seq.*[ (West 2020)], and this Court would have the ability [to] designate parental responsibilities and parenting time pursuant to the Illinois Parentage Act[ of 2015 (750 ILCS 46/101 *et seq.* (West 2020))].” The phrase “presumed parent” is not defined in the embryo context. Compare 750 ILCS 47/10 (West 2020) (providing no definition) with 750 ILCS 46/103(p), 204 (West 2020) (defining presumed parent when a child is born). The Gestational Surrogacy Act does, which addresses the rights of parentage such as custody, however, define “Intended parent.” 750 ILCS 47/10 (West 2020) (an intended parent “is a person or persons who enters into a gestational surrogacy contract with a gestational surrogate pursuant to which he or she will be the legal parent of the resulting child. In the case of a married couple, any reference to an intended parent shall include both husband and wife for all purposes of this Act. This term shall include the intended mother, intended father, or both”). To be considered an “Intended parent” under section 15 of the Gestational Surrogacy Act, the following must be satisfied: (1) a gestational surrogacy contract exists, (2) the person in question is a party to the contract, (3) the person in question is an “intended mother” or an “intended father.” *Id.* § 15(b)(1), (2), (d)(3). Here, assuming Alexander neither enters into a surrogacy agreement nor remarries Eneya prior to any birth, he will not be a parent as contemplated by the trial court. Further, because he is not considered an intended parent, he is not obligated to support any resulting child. *Id.* § 30(a); see also *id.* 25(c)(4)(ii) (requiring surrogacy contracts to provide that the intended parents or parent assume sole responsibility for support of the child immediately upon birth). Nevertheless, it remains that, as a gamete donor, Alexander “may be liable for child support only if he *** fails to enter into a legal agreement with the intended parent or parents in which the intended parent or parents agree to assume all rights and responsibilities for any resulting child, and the gamete donor relinquishes his *** rights to any gametes, resulting embryos, or children.” *Id.* § 30(c). However,

as the foregoing sets forth, there is a mechanism for Alexander to relieve himself of any duty of support.

¶ 121   With the above properly framed, we balance the parties' interests using the *Rooks* factors and award the frozen embryos to Eneya. The evidence demonstrated that Eneya is unable to produce more eggs, she is otherwise unable to carry a child to term, and the embryos are the only means by which she can have a biological child. Eneya's interest in preserving and potentially using the embryos to procreate outweigh Alexander's stated interest in donating them but not to her. See *Szafranski II*, 2015 IL App (1st) 122975-B, ¶¶ 128-29; *Reber*, 42 A.3d at 1140-42. Further, Alexander's position at trial, expressed without explanation—that he wanted the frozen embryos donated but not to Eneya—arguably suggested his attempt to use the embryos as unfair leverage in the parties' divorce, a position that weighs against him. Awarding the embryos to Eneya, who cannot have a biological child without them, is the appropriate resolution when the parties' interests are weighed and, as noted, is consistent with Illinois and foreign case law with similar facts. Accordingly, we reverse the trial court's ruling on this issue. Further, the court's award to Alexander of the escrow is reversed, and the escrow is awarded to Eneya.[6]

¶ 122                              C. E.K.'s Day Care

¶ 123   Eneya next contends that the court erred in exercising its "own preference" in selecting a day care provider when it ordered E.K. to attend day care at Kiddie Academy rather than Chateau Elite. Eneya notes that the JDOM provides that both parties shall share decision-making for E.K., except for the choice of day care. The court ordered E.K. to remain at Kiddie Academy.

_____

[6]The parties have clarified that the escrow is related to the surrogacy undertaking rather than the embryos.

¶ 124   The trial court must allocate decision-making responsibilities according to the child's best interests. 750 ILCS 5/602.5 (West 2018); *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. In making that determination, the court must consider all relevant factors, including the 15 set forth in section 602.5(c) of the Act. *Jameson*, 2020 IL App (3d) 200048, ¶ 47. However, the court is not required to make explicit findings on each factor or refer to every factor. *Id.* We will not disturb the court's ruling on decision-making responsibilities unless that ruling is against the manifest weight of the evidence. *Id.*

¶ 125   Pursuant to section 602.5(b) of the Act (750 ILCS 5/602.5(b) (West 2018)), one of the issues affecting the child is education, including the choice of schools. Where the parties cannot agree on an allocation of parental responsibilities, that determination falls to the court. *Id.* Here, Eneya initially enrolled E.K. in day care in Buffalo Grove, but she did not send E.K. there, because Alexander objected to day care in general and wanted a say in which day care E.K. attended. Alexander researched various facilities, and Eneya rejected all of Alexander's suggestions. Then, Eneya unilaterally matriculated E.K. at Chateau Elite. The court indicated that it knew about this and had warned Eneya that it would not be bound by her unilateral decision. At the hearing on Alexander's motion to allocate parental responsibilities, Whitty testified that Chateau Elite would not provide Alexander access to information concerning E.K. She also testified that Chateau Elite would not furnish any information to her, nor would Eneya sign authorizations so that Whitty could obtain information from Chateau Elite. Whitty's next concern was that Chateau Elite was not following Illinois Department of Health guidelines regarding masks. Whitty's last concern was that E.K. should not be in day care full-time. Whitty recommended that E.K. attend Kiddie Academy in Arlington Heights part-time. Kiddie Academy, according to Whitty, would

accommodate Alexander, who was concerned that Chateau Elite was monolingual Russian and would not help E.K. learn English.

¶ 126 The record shows that the court considered, without specifically articulating, factor number (8) under section 602.5(c), the child's needs. The court expressed that its main concern was whether E.K. should be in day care full-time. The court determined that it was in E.K.'s best interests to be cared for at home by Eneya and her parents. Failing that, because Eneya needed to find work, the court determined that E.K. should attend day care part-time.

¶ 127 The record also shows that the court considered factor number (10), whether a restriction on decision-making was appropriate. Whitty testified that Chateau Elite would resist, or outright refuse, sharing information about E.K. with Alexander. Moreover, Eneya used the fact that E.K. was already attending Chateau Elite to attempt to manipulate the court into leaving him there. Both of those circumstances impacted factor number (11), the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. It is clear that Eneya wanted E.K. in a facility that would not share information with either Whitty or Alexander. The record is also clear that Kiddie Academy was suggested by Whitty and was not the court's "own preference." Accordingly, we determine that the court's decision to place E.K. in day care at Kiddie Academy was not against the manifest weight of the evidence.

¶ 128                         D. The Permanent Restraining Order

¶ 129 The court found that Eneya absconded with E.K. from New York and that then, after Alexander located them in Naperville, she moved to Buffalo Grove without informing Alexander of their whereabouts. The court found that Eneya made these moves in secrecy to prevent Alexander from having a relationship with E.K. Because Eneya was, in the court's opinion, a "flight risk" and inclined to "abscond" with E.K., the court permanently restrained Eneya from

moving from her home in Buffalo Grove or possessing E.K.'s passport without leave of court. Eneya argues that the court abused its discretion in entering the permanent restraining order.

¶ 130  We determine that Eneya has forfeited this argument. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires that arguments be accompanied by citations to relevant authorities. Here, Eneya cites one case for the standard of review but cites no authority for her contentions. "Where an appellant has failed to support his or her arguments with citations to authority, [the appellate court] will not research the issues on the appellant's behalf." *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 20. Accordingly, we deem this argument forfeited.

¶ 131                               E. Child Support

¶ 132  In paragraph 11 of the JDOM, the court found that Alexander's statutory child support obligation is $636 per month. This amount is based on Alexander's income of $4800 per month and Eneya's income of $3000 per month. In paragraph AA of the JDOM, the court found as follows: "Because of the expense to visit his child, the Court will deviate down from the statutory amount of child support to $100 per month payable by [Alexander]." Those are the only findings that the court made. Eneya argues that the court's failure to make specific findings justifying a deviation from the statutory guidelines warrants reversal. We agree.

¶ 133  Section 505 of the Act (750 ILCS 5/505 (West 2018)) governs child support. Section 505(a) (*id*. § 505(a)) provides that the trial court may order either or both parents owing a duty of support to pay an amount that is "reasonable and necessary" for support. The duty of support includes the obligation to provide for the reasonable and necessary physical, mental, and emotional health needs of the child. *Id.* Pursuant to section 505(a)(1) (*id*. § 505(a)(1)), the Illinois Department of Healthcare and  Family Services established child support guidelines that include a schedule of basic support obligations. Section 505(a)(1.5) (*id*. § 505(a)(1.5)) provides that the court "shall"

compute the basic child support obligation by (1) determining each parent's monthly net income, (2) adding the parents' net monthly incomes together to determine their combined net monthly income, (3) selecting the corresponding appropriate amount from the schedule of basic child support obligations based on the parents' combined net monthly income and their number of children, and (4) calculating each parent's percentage share of the basic support obligation. The court *must* apply the guidelines unless the court makes a finding that application of the guidelines would be inappropriate, after considering the best interests of the child and evidence of the following relevant factors: (1) the financial resources and needs of the child, (2) the financial needs and resources of the parents, (3) the standard of living that the child would have enjoyed had the marriage not been dissolved, and (4) the physical and emotional condition of the child and his or her educational needs. *Id*. § 505(a)(2). There is a rebuttable presumption that the amount of the child support obligation that results from application of the guidelines is the correct amount of child support. *Id*. § 505(a)(3.3). The proponent of a deviation from the guidelines has the burden of producing evidence that compelling reasons exist to justify the deviation. *In re Marriage of Hill*, 2015 IL App (2d) 140345, ¶ 29. Any deviation from the guidelines "shall" be accompanied by the court's written findings specifying the reasons for the deviation and the presumed amount without a deviation. 750 ILCS 5/505(a)(3.4) (West 2018). The trial court has the discretion to determine the appropriate amount of child support, and we will not reverse that determination absent an abuse of discretion. *In re Marriage of Gabriel*, 2020 IL App (1st) 182710, ¶ 56.

¶ 134   Here, using the guidelines, the court computed Alexander's child support obligation at $636 per month. Eneya does not quarrel with that finding. Rather, Eneya argues that the court did not consider the section 505(a)(2) factors when deviating from the guidelines, nor did the court include specific written findings justifying its deviation. In urging us to affirm the child support

judgment, Alexander culls findings from other parts of the JDOM and then grafts those onto what he considers the appropriate section 505(a)(2) factors. In this way, Alexander concludes that the court considered those factors. Specifically, Alexander argues that the court found that Alexander's monthly income was mostly financed by the small business loan; due to the fact that Eneya moved E.K. to Illinois from New York, Alexander's monthly travel expenses to visit E.K. are $1200; and Eneya moved to Illinois "under cover of darkness," which "severely limited" Alexander's ability to parent E.K. Alexander maintains that those findings focus on E.K.'s need to have a relationship with Alexander and Alexander's financial resources.

¶ 135   Even granting Alexander's argument, in deviating from the guidelines, the court focused solely on Alexander's resources and needs but failed to consider E.K.'s financial resources and needs, the standard of living E.K. would have enjoyed had the marriage not been dissolved, and E.K.'s physical and emotional condition and his educational needs. The child's need is a relevant factor under section 505(a)(2). *People ex rel. Graham v. Adams*, 239 Ill. App. 3d 643, 647 (1993). We also note that the record contains little evidence as to E.K.'s needs. Consequently, because the court failed to consider all of the section 505(a)(2) factors, and the record contains scant evidence as to E.K.'s  needs, we vacate the child support award and remand to the trial court for recalculation of the child support award in accordance with section 505(a)(2) of the Act. See *In re Marriage of Jelinek*, 244 Ill. App. 3d 496, 509 (1993) (court remanded the cause to the trial court for recalculation of the child support award where little evidence was adduced as to the needs of the children).

¶ 136                                F. The Property Award

¶ 137   Eneya next contends that Alex Solutions, the Toyota Highlander, and the embryo escrow are marital property and that, therefore, the trial court's award of these items to Alexander as his

sole property was error under either abuse-of-discretion or *de novo* review. Section 503(d) of the Act requires the court to divide marital property in "just proportions considering all relevant factors," which the statute lists. 750 ILCS 5/503(d) (West 2018). The relevant factors include the contributions of each party, the duration of the marriage, the relevant economic circumstances of each spouse, and the reasonable opportunity of each spouse for future acquisition of assets and income. *Id*. § 503(d)(1), (4), (5), (11). "Marital property" means "all property, including debts and other obligations, acquired by either spouse subsequent to the marriage," except certain types of property not relevant here. 750 ILCS 5/503(a) (West 2018). " 'The touchstone of proper and just apportionment is whether it is equitable in nature,' which does not require mathematical equality." *In re Marriage of Thornley*, 361 Ill. App. 3d 1067, 1071 (2005) (quoting *In re Marriage of Dunlap*, 294 Ill. App. 3d 768, 778 (1998)). When determining the distribution of property, the court must first determine what constitutes marital property versus nonmarital property. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 65. Section 503 of the Act requires the court to classify property as either marital or nonmarital before dividing it upon the dissolution of the marriage. *Id.* We will not reverse a trial court's distribution of marital property absent a clear abuse of discretion. *Thornley*, 361 Ill. App. 3d at 1071.

¶ 138   Here, we have already determined that the court's awarding the embryo escrow to Alexander was against the manifest weight of the evidence.

¶ 139   Regarding the Highlander and Alex Solutions, Eneya makes no argument except that those items are marital property, as if that settles the question of their distribution. However, that is only the initial inquiry, and Alexander does not dispute that they are marital property. Eneya argues in one conclusory sentence that Alexander has not overcome the presumption of marital property. Eneya's failure to make a cogent legal argument regarding why the court abused its discretion in

dividing the property forfeits this issue. See *Hall*, 2012 IL App (2d) 111151, ¶ 12 (mere contentions, without argument or citation to authority, do not merit consideration on appeal).

¶ 140                                        G. Dissipation

¶ 141    Before the trial court, both parties claimed that the other dissipated marital assets. Eneya contended that Alexander allowed the decline of Alex Solutions' business to occur contemporaneously with the breakdown of the marriage, and Alexander asserted that Eneya spent marital funds on her attorney fees. The court found that Alex Solutions' decline was caused by COVID-19. It also determined that both parties dissipated marital assets by paying their respective attorney fees. The court equalized the fees by ordering Eneya to pay Alexander $30,000 and then credited Alexander's contribution to day care fees against that $30,000.

¶ 142    "Dissipation" is a spouse's use of marital property for his or her own benefit, for a purpose unrelated to the marriage, when the marriage is suffering from an irreconcilable breakdown. *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 779 (2007). Whether a spouse has committed dissipation depends upon the facts of the case. *Id.* After the spouse alleging dissipation makes a *prima facie* case, the spouse charged with dissipation must show, by clear and convincing evidence, how the marital funds were spent. *Id.* If the spouse fails to meet this burden, the court must find that dissipation has occurred. *Id.* We review the court's factual findings under the manifest-weight-of-the-evidence standard of review, although we review the final property distribution for an abuse of discretion. *Id.*

¶ 143    Here, Eneya's argument addresses only the dissipation of Alex Solutions. She makes no argument regarding the court's findings with respect to attorney fees. Alexander argues that Eneya has forfeited this issue, as she includes no citations to the record or authority, in violation of Rule 341(h)(7), which requires the appellant's contentions to contain references to the pages of the

appellate record where evidence may be found as well as citation to relevant authorities. Ill. S. Ct. R 341(h)(7) (eff. Oct. 1, 2020). Contrary to Alexander's assertion, Eneya's argument cites to pages of the record. However, Eneya cites only one case, for the definition of "dissipation." She cites no authority for her substantive argument or her incorrect assertion that *de novo* is the applicable standard of review. Consequently, we deem this argument forfeited. The appellate court is not merely a repository into which the appellant may " 'dump the burden of argument and research.' " (Internal quotation marks omitted.) *CE Design, Ltd. v. Speedway Crane, LLC*, 2015 IL App (1st) 132572, ¶ 18 (quoting *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2007)). Nor is it our obligation to act as an advocate to seek error in the record. *Id.* ¶ 18.

¶ 144                                    H. The Ketubah

¶ 145   Eneya's final argument is that the trial court erred in finding that the ketubah was unenforceable. Specifically, Eneya seeks to enforce the "property division" in the ketubah, which, in her view, obligates Alexander and his heirs to pay her $1 million out of any property that Alexander now owns or will acquire in the future. Eneya argues that Alexander signed the ketubah and agreed, as part of the marriage ceremony, to be bound by it. Alexander contends that the ketubah cannot be enforced because (1) it is written in Hebrew and contains no certified translation, (2) it is unconscionable, and (3) it fails to meet the criteria for a valid prenuptial agreement.

¶ 146   Eneya sought to enforce the ketubah by filing an action for declaratory judgment. The purpose of the declaratory judgment statute is for the court to settle and fix rights before an irrevocable change in the parties' positions, which will jeopardize their claims of right. *Regency Commercial Associates, LLC v. Lopax, Inc.*, 373 Ill. App. 3d 270, 283 (2007). The court found that the ketubah was not an enforceable contract but that it was in the nature of a marriage vow.

Whether a valid and enforceable contract exists is a question of law (*Northern Illinois Construction Co. v. Zale*, 136 Ill. App. 3d 822, 824 (1985)), subject to *de novo* review (*Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007)).

¶ 147   Alexander argues that the trial court properly found the ketubah to be unenforceable because it is written in Hebrew and there is no certified English translation. English is the official language of Illinois, and a certified translation of a foreign-language document is required. *Valdivia v. Chicago & North Western Transportation Co.*, 87 Ill. App. 3d 1123, 1127 (1980). Eneya seems to argue that the issue of the translation was forfeited because Alexander did not adequately raise it before the trial court or provide his own translation. We agree that the translation, not being certified, is not reliable, but, even assuming its adequacy, we agree that the ketubah is unenforceable.

¶ 148   Eneya relies on *In re Marriage of Goldman*, 196 Ill. App. 3d 785 (1990), where the court affirmed the grant of specific performance of a ketubah. In *Goldman*, the wife presented expert testimony from two Orthodox Jewish rabbis that the parties' ketubah provided that the husband would obtain a "get," which is a Jewish divorce allowing the wife to remarry and the children born to a second marriage to be recognized as legitimate. *Goldman*, 196 Ill. App. 3d at 789-90. The appellate court held that the evidence supported that the husband had agreed to obtain a get and that uncontroverted expert testimony established that Orthodox Jewish law requires the husband to obtain and deliver to the wife an Orthodox get upon dissolution of marriage. *Id*. at 793.

¶ 149   Here, Eneya does not seek to enforce any reasonable terms established, according to expert testimony, as pertaining to Jewish law. Instead, she seeks to enforce a purported promise of Alexander, on behalf of himself and his heirs, to pay her $1 million from all of the property that he may ever own. The court found, and Eneya does not dispute, that the entire marital estate is so

negligible that it does not have any monetary value. Alexander's income from the small business loan proceeds is $4800 per month. Alexander testified to his debt, including to his brother, who is paying a portion of Alexander's child support obligation to Alexander's ex-wife in Israel. A contract term can be invalidated on grounds of procedural unconscionability, substantive unconscionability, or both. *Zuniga v. Major League Baseball*, 2021 IL App (1st) 201264, ¶ 14. Substantive unconscionability arises where contract terms are inordinately one-sided in one party's favor. *Zuniga*, 2021 IL App (1st) 201264, ¶ 14. Here, when the court asked Eneya's counsel how the ketubah could be specifically enforced, counsel had no answer. In sum, we agree with Alexander that the purported agreement for $1 million is unconscionable. Accordingly, we affirm the court's determination that the ketubah is unenforceable.

¶ 150                                    III. CONCLUSION

¶ 151   For the reasons stated, we affirm the judgment of the circuit court of Du Page County in part, reverse it in part, vacate it in part, and remand.

¶ 152   Affirmed in part, reversed in part, and vacated in part.

¶ 153   Cause remanded.

*In re Marriage of Katsap*, 2022 IL App (2d) 210706

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 20-D-811; the Hon. Neal W. Cerne, Judge, presiding. |
| **Attorneys for Appellant:** | Fedor Kozlov, of Law Office of Fedor Kozlov, P.C., of Schaumberg, for appellant. |
| **Attorneys for Appellee:** | Brian J. Hurst, of Hurst, Robin & Kay, LLC, of Chicago, for appellee. |